BLUE et al. v. UNITED STATES.

CLARK et al. v. SAME.

PARDEE et al. v. SAME.

Nos. 9241–9243.

Circuit Court of Appeals, Sixth Circuit.

Oct. 14, 1943.

Edwin Judy and Victor A. Ketcham, Jr., both of Columbus, Ohio, Grant E. Mouser, Jr., of Marion, Ohio, and Matthew L. Bigger, of Columbus, Ohio, for appellants.

Calvin Crawford, of Dayton, Ohio, Ray J. O'Donnell, of Columbus, Ohio, and Robert E. Marshall, of Cincinnati, Ohio, for the United States.

Before HICKS, SIMONS, and McALLISTER, Circuit Judges.

McALLISTER, Circuit Judge.

Appellants were indicted for using the mails in furtherance of a scheme to defraud, and for criminal conspiracy to commit the same offense. Some were convicted on the mail fraud charge; others, on both charges. Numerous errors are claimed, based on erroneous admission of evidence; prejudicial conduct of the trial court and of the district attorney; abuse of discretion; and denial of motions to quash the indictment, to require a bill of particulars, and for separate trials. It is further claimed that there was no proof of conspiracy or use of the mails in furthering the alleged fraud; that the verdict of the jury was against the weight of the evidence; and, on behalf of certain of the appellants, it is contended that the Statute of Limitations is a complete defense to the claimed illegal acts. As charged by the Government, the fraud consisted of a scheme in which cemetery lots were sold to the public for purposes of investment.

The history of the case commences with the coming of Robert Marshall to Marion, Ohio, in the fall of 1933. Marshall was a former Salvation Army worker and bible salesman, preacher, and graduate of a theological seminary. Before his arrival in Marion, he had been engaged as a sales manager in a cemetery project in which lots had been sold for purposes of interment, as well as for investments. In selling the cemetery lots for investments in that project, purchasers were promised that their money would be doubled. A few months before Marshall came to Marion to organize his cemetery, he left the other project, in which purchasers had been promised double their money back in listing agreements with the cemetery company. At that time, the company was "floundering on the rocks," as Marshall expressed it.

Marshall averred that his purpose in coming to Marion was to undertake the development of a cemetery for the benefit of poor people, whereby they could secure cheap and respectable burial and avoid the potter's field. He denied that he was primarily interested in profit for himself. In order to carry out his purported objective, he took an option on 71.38 acres of land on the outskirts of Marion, at $100 per acre—or a total of $7,138. He then caused two corporations to be organized— Forest Glen Memorial Park Association, a nonprofit corporation, and Forest Glen, Incorporated, a corporation for profit. A contract was then entered into between the two corporations, whereby Forest Glen, Inc., was made the exclusive sales agent of Forest Glen Memorial Park Association. By the terms of this contract, Forest Glen, Inc., was to retain 90% of the money received from the public in the sale of cemetery lots, and was to purchase and improve the property; the remaining 10% was to be paid to Forest Glen Memorial Park Association, as a fund for perpetual care of the cemetery. By the terms of another contract, between Forest Glen, Inc., and Marshall, he was to receive 50% of all money received from sales, for services of supervision and selling expenses.

Within a month after the new cemetery was organized as a corporation, sales of burial lots commenced. In November, 1933, sales at wholesale "for investment," brought in $7,112.68, and deeds for the lots were issued to purchasers, although nothing had yet been paid on the option for the land so sold. In December, 1933, $19,413.74

had been collected in exchange for deeds of cemetery lots; and as yet nothing had been paid on the option. In January, 1934, $35,385.88 had been similarly collected from the public. But at this time, only $2,500 had been paid on the option, and the title to the land was still in the optionor. All of these sales had been to "investors." The first lots sold for burial purposes were in January, 1934, and the total receipts therefrom amounted to $150; and at this time, there had been paid back to the so-called investors, a total of $7,092. As is obvious, these "profits" were paid out of the same money that the public had paid in as investments, there having been no earnings of any kind resulting from the project. .

In addition to the first cemetery, Forest Glen Memorial Park Association, there were subsequently formed two more cemeteries—Glen Haven Memorial Park Association, near Springfield, Ohio, and Glen Rest Memorial Estate, near Columbus, Ohio,—and contracts were executed similar to those between Forest Glen Memorial Association, Forest Glen, Inc., and Marshall. All sales, for investment and for "utility," in the three cemeteries, were centered in the office of Forest Glen, Inc., under the management of Robert Marshall.

In explanation of the scheme, Marshall testified that sales of the cemetery lots were made on two plans: for investment, and for "utility"—or for burial purposes. To investors, lots were sold in blocks at a price of $50 per lot. For utility, they were sold for $125 per lot. When lots were sold for investment, Forest Glen, Inc., simultaneously agreed to resell the lots for the investors at $100 per lot—or 100% profit— within a three-year period; and this was the compelling inducement for purchase, made by the company, acting through Marshall.

Assurance of such returns to investors was allegedly based upon the great profits resulting from sales of individual lots for utility. Out of the sum of $125 per lot, to be received on utility sales, the investor was to be repaid $100, thus doubling his investment and leaving a profit for Forest Glen, Inc. The reason given by Marshall as to why he and his associates agreed to resell the lots to the public for burial purposes at such a great increase in price, was that Forest Glen, Inc., would, from the purchase price paid by the investor, make a pro rata expenditure of $15 per lot, in the building and improvement of the

cemetery. Such an expenditure, it was claimed—together with sales energy and supervision—would cause the lot sold at $50 to the investor, to bring $125 on resale. Furthermore, it was insisted by Marshall that such a cemetery lot, after the pro rata expenditure of $15 per lot, would leap in value 10% per year over the retail price.

On May 16, 1938, as a result of legal proceedings, the projects were placed in the hands of trustees, and the operation of Forest Glen, Inc., was ended. Bankruptcy thereafter ensued. It was time. Three cemeteries had actually been built and partially developed. They included structures on the premises, consisting of chime towers, "cathedral lounges," and caretakers' lodges, together with lakes, winding roads, trees, and shrubbery. The total expenditure for purchase and improvement of the cemeteries was $424,365.59. But $1,840,582.81 had been taken from the investors for these projects. Of this amount, $803,950.73 was returned to investors, under the designation of profits, listing fees, premiums, and so on. This resulted in a loss, out of pocket, to investors, as of the above date, of $1,036,432.08 (many of whom were left, however, with great batches of cemetery lots on hand). During the life of the venture, the company had received a total of only $344,568.36 through the sale of lots for burial purposes—and in repaying to investors $803,950.73, had distributed, as profits, $459,382.37 more than had been received from the sales for burial purposes. They were, therefore, repaid this amount out of the same money which they had paid in for their investment.

As of May 16, 1938, when the trustees were appointed, the perpetual-care funds, into which $130,672.03 was paid, had been reduced by dissipation to $2,117.69 in cash. Accounts payable for cemetery lots, mortgage notes, and odds and ends of other securities, had been deposited when the cash was withdrawn from the perpetual-care funds. The total of such substituted collateral, as carried on the books of the company, was $151,376.44, an undetermined amount of which was worthless. The value of accounts owed Forest Glen, Inc., for lots sold for burial purposes, was appraised at $272,726.68 by Government experts, as of the above date.

On the same date, Forest Glen, Inc., owed its investors $2,141,439.

It had on hand a cash balance of $390.61.

In a sense, the project was similar to the scheme of Ponzi—familiar to the courts, and to all acquainted with the lore and study of criminal fraud—who represented that "he was able to make, within a very short time, 100 per cent. on all money intrusted to him, and was generously sharing this astounding profit with investors who should furnish him the money to enable him to do the business on a large scale. * * * His scheme was simply the old fraud of paying the earlier comers profits out of the contributions of the later comers." Lowell v. Brown (In re Ponzi), D.C.Mass., 280 F. 193, 196. "He was always insolvent; as time went on he became more and more so, as his business succeeded * * *". Cunningham v. Merchants' Nat. Bank (In re Ponzi), 1 Cir., 4 F.2d 25, 26, 41 A.L.R. 529. The evidence amply sustained the conclusion of the jury that the scheme was fraudulent.

We come, then, to the question of the association of appellants in the project. Necessarily, the scheme called for a large number of salesmen. These were of two classes: salesmen of lots for investment, and salesmen of lots for utility. The chief inducement to the investor was the promise of doubling his money. To instill confidence, and give the impression that such promises could actually be fulfilled, the first investors were paid out of the same money that they had paid into the company. These returns were called profits, although no sales of burial lots for utility had been made when the first "profits" were paid—and utility sales were the necessary source of profits. Subsequently, cemeteries were built—from a small part of what the investors paid in—and sales of lots for burial purposes were made, followed by interments in the cemeteries.

Marshall, in order to carry out the plan, purchased lists of stockholders, from a number of companies engaged in the business of supplying such lists. These gave the names of Ohio residents, living in the general vicinity of the cemeteries, who had deposits and stocks in building and loan companies, and other corporations. The evidence discloses that various of these lists were placed in the hands of investment salesmen by Marshall. They were also available at the office of the company, for any salesman interested in locating sales prospects.

A great number of the so-called investors were aged persons of no financial or busi-

ness experience—men whose savings were accumulated through years of toil on farms or in factories, or women who were living on money left to them by deceased husbands.

Investment sales commenced under the "escrow plan," in which 20% of the investment was to be placed in a fund which, together with funds received from the sale of lots for burial purposes, was to be repaid in monthly allotments to the investor, until his money was doubled.

The escrow plan was then followed by the "2% plan," in which 2% per month of the promised return was to be paid monthly to the investor, until he received back his investment and the profit thereon; and all monthly sums so repaid were credited upon the promised returns. Although this was called the "2% plan," it was in reality a repayment of 12% per year on the promised returns, or 24% per year on the original investment.

As payments under this plan became increasingly in default, a third scheme, known as the "6% plan," was used, in which the investor was repaid 6% per year in monthly installments as a premium for listing the property with the company for resale. These payments were in the nature of interest and were not to be charged against the promised returns. After numerous sales had been made under the 6% plan, a further plan, known as the "allocation contract," was devised.

Under the allocation plan, after an investor purchased a section, the company agreed to sell it for him at a profit of from 50 to 100 per cent. The sale for the investor was to be made to the public for burial purposes, or for utility. When such sales were made by the company (for the benefit of investors), 25% of the money received therefrom was to be allocated to all of the investors in a block or certain area of the cemetery. Other contracts provided for allocations of 15% of utility sales, and others provided that, instead of allocation of receipts from utility sales to investors in a certain area from which such utility sales were made, the allocation would be made to all investors in the entire cemetery. These printed allocation contracts did not provide for repayment at any specified time; but, when necessary as an inducement in the making of a sale, there were typed into such printed contracts, many various provisions—some agreeing to pay 10% per year on double the invest-

ment, together with provisions for substantial monthly payments.

These transactions were further complicated by the giving of promissory notes by the company to a so-called investor, in which it was agreed that it would pay back the amount of the investment, with high interest—the investor to hold deeds to cemetery lots as security for payment of the notes. These note obligations, in themselves, were ordinary borrowings by the company, for which it agreed to pay back the principal sum within a year, together with 25% interest. But such promissory notes appear also to have been accompanied by listing contracts, in which the company agreed to pay high premiums to the lender or security holder, for the privilege of reselling the lots; and the notes also appear to have been executed simultaneously with contracts of investment.

Subsequent to the foregoing contracts, there was evolved the contract of conversion to utility, in which the investor who had been promised profits was induced to exchange his contract for one of outright ownership of lots, on the representation that he could himself sell them for three or four times what he had paid, and keep the entire profits for himself.

In many instances, where payment of the stipulated distributions was in default, and investors were complaining, Forest Glen, Inc., acting through Marshall, would "pick up" certain lots, apparently repurchasing them from the investor for the company, and repaying to the investor double the amount of the investment. In some cases, the contracts provided for only 50% profit instead of 100%, but the scheme operated in the same manner. The evidence discloses that large sums in cash were obtained by Forest Glen, Inc., and by Marshall and his salesmen, from investors who —although they could not be induced to part with their money on the guarantee and promise of 100% profits and 10% interest— were completely persuaded when they found that, in particular instances, such cash profits seemed to be actually paid by the company, through allocations and "pick ups." Of course, these profits and payments to certain selected investors required only a comparatively small percentage of the cash which was received from the public.

Where an escrow contract was converted to a 2% plan, the amount of periodic payments required to be made by the company

would be reduced; and where a 2% plan was converted to a 6% plan, the amount of such periodic payments would be further reduced. However, in the latter case, the ultimate repayment price which was promised, would be increased because the amount repaid thereunder was in the nature of interest and was not to be charged against the principal. When any of the contracts were converted to "utility," the necessity of repayment by the company to the investors was completely eliminated, as the investors then held the lots discharged from any obligation of the company to resell. On all of these plans of sales and conversion, the salesmen were paid commissions by the company. Marshall and appellants were progressively shuffling investors over to the successive contracts in order to diminish the amount of the monthly sums to be repaid; and as a final step, were shifting the ownership of the lots over to the investors, free from the previous obligation to pay high interest and double the investment. When the ramshackle project finally collapsed, many investors were hopefully holding—in the nature of security, or as their own property—huge batches of cemetery lots.

From the evidence, it appears that the salesmen, in numerous instances, had lists of investors in various building and loan companies. The cash values of such investments, at the time, were approximately half their face value, and regular dividends were not being paid. Salesmen would advise that the investment in question would be worthless, or questionable, and disclose the opportunity of making good on such losses by an investment in cemetery lots. Usually, the salesmen secured their deposit books from such investors, took them to the building and loan companies, and received cash for the deposits, for which cemetery lots were exchanged. Salesmen would then communicate with Marshall, asking that a good distribution of returns be made to a certain investor in order to secure additional money on further sales. In other cases, the salesmen would ask Marshall to pick up a section, or a number of sections, from some investor. This meant that the company would buy back the sections at double the amount paid for them, and thus encourage the investor to believe that his lots were bringing in 100% in profits, in order to promote further sales. At the same time that the company was repurchasing sections at $100 apiece, it

was short of cash; in default on its interest payments and monthly installments to investors; and had thousands of sections on hand, which it was desperately trying to sell at $50 apiece.

Appellants were not all accused of the same acts. It is contended that some were guilty of one type of conduct and others of a different kind. Among the acts of various of the appellants, as disclosed by the evidence, were the following: representations that the money invested would be doubled within a three-year period, or some other definite time; representations that the investments were safe—safer than any other type of investment, and safer than insurance; arrangements for the giving of promissory notes by the company, agreeing to pay annual interest of 25% to the lenders; special contracts with certain investors, promising double returns and annual interest of 10% on double the amount of investment; making of numerous other special contracts in which selected investors were promised larger returns than others; successful requests to Marshall to repay cash profits to investors when there were no profits; similar requests that the company repurchase lots from certain investors in order to carry out the deception that the plan actually doubled investments; requests (in order to secure further money from investors and to lure prospective investors) that checks for the promised returns be placed in the hands of salesmen so that they could personally deliver the checks and have the favorable opportunity of making further sales; arrangements that discrimination be shown in the payment of the promised returns, so that certain investors would be paid large apparent profits, with the object that prospective investors who were watching the particular transaction would invest their money; advising certain purchasers that they would be "let in as favorite customers" on special contracts providing for large interest returns; statements that the Government was behind the cemetery projects and that the State had provided the cemetery plan for people who needed income investments; promises to different investors that they would be completely repaid the promised returns within 6 months, 14 months, 16 months, and 20 months; promises to other investors that they would be paid 12%, 16%, 20%, and 25% per annum, in addition to great profits; representations that all the lots had already been sold in certain

cemeteries, made for the purpose of persuading prospective investors that the projects were successful and that they might lose the opportunity to profit therefrom; referring prospective investors to others who had invested and were receiving promised returns, at the same time that other investors in like circumstances were receiving nothing whatever; offering to pay certain investors, whose promised returns were long in default, if they would advise prospects that the investment was safe; requests that the company purchase back sections in order to avoid complaints and suspicion; using so-called "sucker lists" to locate investors; unjustified representations that the cemeteries were necessary in the various localities; taking advantage of aged and ignorant, inexperienced men and women; and generally assisting Marshall to secure money by means of agreements to pay huge returns and interest.

Here, it may be remarked, as said by Judge Simons, that "if one sets out to victimize persons least able to guard themselves against fraudulent schemes * * * the lack of guile on the part of those generally solicited may itself point with persuasion to the fraudulent character of the artifice." Norman v. United States, 6 Cir., 100 F.2d 905, 907.

 When a scheme to defraud is shared in by two or more, it becomes a conspiracy; the rules of evidence are the same as where a conspiracy is charged (Robinson v. United States, 9 Cir., 33 F.2d 238); and the act of each party in furthering the common scheme is the act of all. Davis v. United States, 5 Cir., 12 F.2d 253. If one's intent is to defraud when he joins a dishonest scheme, he becomes a part of the scheme, although he may know nothing but his own share in the aggregate wrongdoing. Silkworth v. United States, 2 Cir., 10 F.2d 711. Formal agreement is not necessary, it being sufficient if there is an association in the purpose to defraud.

 From a review of the record, the evidence of the conduct of appellants and their statements and representations to the investors warranted a finding that such statements and representations were made pursuant to a general scheme to defraud. Furthermore, the testimony justified the jury in its inferences that there was an understanding between appellants and Marshall, and between each other; that there was a common effort and concert of action on their part in carrying out a fraudulent enterprise; and that they were parties to a scheme to defraud. While the evidence justified a conclusion of the jury that many of the appellants were guilty of most of the foregoing conduct, and that others participated therein to a much lesser extent, the latter are not thereby exonerated from guilt of the offense charged.

In this regard, it is to be observed that Marshall may have imposed on some of his own salesmen, and that certain of them may have acted in good faith. Among those whose complicity, as revealed by the proofs, appears of lesser extent than that of others, may be mentioned appellant McClure. The strongest evidence against him was disclosed with regard to a sale made in 1934 to a railroad switchman. McClure himself was employed, at the time, as a yard carman. Testimony revealed that he represented he had made a careful investigation of the neighborhood of one of the cemeteries, the average number of deaths in the locality, etc., and that the cemetery was "sadly needed"; that the investor would receive returns of 24% per annum, payable monthly, until twice the amount of the investment had been thus repaid. It is somewhat unique to find a railroad yard man in the role of a stock salesman; and it would require some degree of credulity for anyone knowing of his occupation, to rely upon his representations and advice as a financier. Nevertheless, McClure was engaged in the selling of lots three years subsequent to the foregoing incident, inserting special provisions in contracts, in his own hand, delivering "dividend" checks in person, and attempting to secure substitution of other contracts for prior agreements. His total commissions amounted to $4,025.16, indicating sales approximating an aggregate of $27,000. Under the facts shown, the question of McClure's guilty association, as well as that of others similarly related to the scheme, was properly submitted to the jury.

Assuming, then, that the evidence sustained the conclusion of the jury that appellants knowingly participated in a scheme to defraud, we come to the question whether they were guilty of using the mails to defraud under § 338, Title 18 U.S.C.A., or of conspiracy so to do under § 88, Title 18 U.S.C.A.

 Many cases are cited by appellants to sustain the proposition that, in or-

der to sustain an indictment under the above § 338, it is necessary to prove both fraudulent intent and, also, intent that the mails should be used to promote the fraud. Such cases were decided under § 5480 of the Revised Statutes (amended by the Act of March 2, 1889, 25 Stat. 873). But this section was thereafter amended and became § 215 of the Criminal Code (Act of March 4, 1909, c. 321, 35 Stat. 1088, 1130, § 338, Title 18 U.S.C.A.). Under the former statute, the elements of the offense were that the persons charged in the indictment must have devised a scheme to defraud and intended to effect it by the use of the mails, as well as have used the mails to carry it into effect. The difference between the two statutes is that under the former, the scheme must have contemplated the use of the mails; and under the latter, it is only necessary that a party devised a scheme to defraud and, afterward, placed or caused to be placed a letter in the mails for the purpose of executing the same. Morris v. United States, 8 Cir., 7 F.2d 785. Under § 215 of the Criminal Code, it is sufficient that, having devised a scheme to defraud, the mails are actually used in effecting it; and a purpose to use the mails is no longer an essential element of the scheme devised, as it was under the former statute. United States v. Young, 232 U.S. 155, 34 S.Ct. 303, 58 L.Ed. 548; Trent et al. v. United States, 8 Cir., 228 F. 648; Farmer v. United States, 2 Cir., 223 F. 903, certiorari denied 238 U.S. 638, 35 S.Ct. 940, 59 L.Ed. 1500; Preeman v. United States, 7 Cir., 244 F. 1; Depew et al. v. United States, 3 Cir., 255 F. 539; Smith v. United States, 8 Cir., 267 F. 665; Bogy v. United States, 6 Cir., 96 F.2d 734; Guardalibini v. United States, 5 Cir., 128 F.2d 984. It is immaterial whether the persons devising the scheme had intended to use the mails or whether anyone was actually defrauded. The mailing of the letter may be by an innocent agent, unconnected with the schemers. Stapp et al. v. United States, 5 Cir., 120 F.2d 898. Where a party participating with others in a scheme to defraud presents a check to a branch bank in effecting the scheme, and it can be reasonably foreseen that the check will pass through the mails to be paid, it is sufficient to charge and show that the fraudulent scheme was one which reasonably contemplated the use of the mails. In such a case, the party presenting the check "causes" the mails to be used in furtherance of a

scheme to defraud; and all of those participating in the scheme, being partners in crime, are chargeable with his conduct in the matter; Hart v. United States, 5 Cir., 112 F.2d 128; and where those connected with a scheme to defraud must have anticipated and known that the mails would be used in its execution as a matter of course, the use of the mails by one or more of the parties in effecting the scheme, becomes the act of each of the co-participants. Ader v. United States, 7 Cir., 284 F. 13.

If the use of the mails is such a natural and probable consequence of the execution of the original scheme that all the participants would naturally have foreseen the likelihood that such resort to the mails would be had whenever it appeared expedient so to do in aid of the common purpose, the conclusion would be warranted that they had all consciously participated in bringing about the use of the mails for the purposes stated. Such a bringing about of the use of the mails would be a "causing" of such use, within the intendment of the statute. Shea v. United States, 6 Cir., 251 F. 440.

Where a fraudulent scheme is entered into by several parties, and there is evidence from which the jury can properly infer that the use of the mails by one of the defendants was in furtherance of the fraudulent scheme, and that the scheme was in existence prior to the mailing of the letter, the mailing is, in law, the act of all the defendants. Tincher v. United States, 4 Cir., 11 F.2d 18. Mere incidental and unpremeditated use of the mails in an attempt to defraud may give federal courts jurisdiction over prosecution for violating the Mail Fraud Statute. All with criminal intent who join themselves even slightly to the principal scheme are subject to the statute, although they were not parties to the scheme at its inception, Badders v. United States, 240 U.S. 391, 36 S.Ct. 367, 60 L.Ed. 706; Bogy v. United States, supra; Preeman v. United States, supra; and it is not necessary that the mails be used for communicating with the persons intended to be defrauded. Preeman v. United States, supra; Ader v. United States, supra. Use of the mails for the purpose of retaining the fruits of a fraud, or to convey assurances to lull one into inaction, and to postpone, perhaps indefinitely, the taking of action in respect to the fraud, is within the purview of the statute. United States v.

Spielberger, D.C.Va., 28 F.Supp. 380, 382. See Davis v. United States, 6 Cir., 125 F. 2d 144.

■■■■ There was ample and uncontradicted evidence of use of the mails by both Marshall and a number of the appellants, to sustain the proof required by the statute. There was sufficient evidence to sustain the verdict that there was participation by appellants in a scheme to defraud and the use of the mails in furtherance of the scheme, within the provisions of the statute. We shall discuss hereafter certain exceptions, however, with reference to the conviction of some of the appellants.

Having disposed of the question of violation of the mail fraud law, we come to the question of conspiracy to violate the statute.

■■■■ Conspiracy to commit a crime is a different offense from the crime which is the object of the conspiracy. Morris v. United States, supra. The conspiracy may be accomplished without mailing a letter; and conspiracies to defraud by use of the mails are generally shown by circumstantial evidence. On a charge of conspiracy to violate the statute, the Government has to sustain a heavier burden of proof as to the intent of the conspirators—not only to defraud, but also to defraud by the use of the mails. Farmer v. United States, supra.

Much is said in the briefs of appellants to the effect that the Government does not disclose what the claimed conspiracy consisted of; and that there was no proof of conspiracy or intent to use the mails in furtherance of a fraudulent scheme. The conspiracy consisted of a scheme to defraud people in the sale of cemetery lots. The Government charged not a conspiracy to commit a single act, but a continuing conspiracy to carry on the fraud, co-existent with the duration of the project.

Specific conduct of the eleven appellants found guilty of conspiracy, as disclosed by the evidence for the Government, may be mentioned. Six of them, at various times, wrote letters to Marshall or to his assistant manager, suggesting or asking for special consideration in returns on investments to selected investors; and the Government's evidence shows that all of the appellants convicted of conspiracy represented that the investment in cemetery lots was safe, that the investors could not lose, or—what is, in effect, the same thing—that the investors would double their money or receive returns on their investment with interest of 12%, or 20%, within two, or three, years. Letters were in evidence, written by Marshall to a majority of such appellants, advancing the scheme. He accompanied others in making sales. He wrote letters complimenting investors on the result of their dealings with the conspirators, and sent out letters to all his salesmen from time to time. He was the director of the activity of appellants. They worked through him. The successive sales and conversion of contracts, covering a period of years, resulted from the co-operative efforts of Marshall and appellants. The evidence disclosed repeated relations and sustained association on the part of appellants with Marshall in the continuous course of activity in carrying out the scheme.

■■■■ As the trial court charged, direct proof of the use of words or an explicit agreement is not necessary to show conspiracy, which is usually proved by circumstances. Evidence of concerted action, may show that persons were acting pursuant to a common understanding among them to violate the law in the manner charged. It is sufficient if one or more persons in any manner, or through any contrivance, come expressly or tacitly to a mutual understanding to accomplish a common and unlawful design. It has been said that the acts of a conspiracy, taken by themselves, are rarely of an unequivocally guilty character and they can only be properly estimated when connected with all the surrounding circumstances. People v. Saunders, 25 Mich. 119. When once a conspiracy is shown to exist, which is not ended merely by lapse of time, it continues to exist as to all persons involved until there is shown some affirmative act of withdrawal by persons who attempt to evade responsibility for the acts and declarations of their co-conspirators after the withdrawal. Withdrawal must be evidenced by some act to disavow or defeat the purposes of the conspiracy. Hyde v. United States, 225 U.S. 347, 32 S.Ct. 793. 56 L.Ed. 1114, Ann.Cas.1914A, 614. Here, the scheme continued over a long period of time. In such a case, where the conspiracy is proved, the acts and declarations of one of the conspirators toward the accomplishment of the unlawful scheme are the acts of all. Hyde v. United States, supra. The evidence justified the infer-

ences of the jury that appellants who were convicted of conspiracy knowingly entered upon a scheme to defraud.

With regard to the intent to use the mails, it is the rule that where the accomplishment of the conspiracy contemplated the use of the mails, and such use for the execution of a scheme was essential, intent on the part of the conspirators to use the mails may be inferred (Oliver v. United States, 10 Cir., 121 F.2d 245); and if in the carrying out of the conspiracy, the use of the mails is indispensable, the intent to use the mails as part of the conspiracy is thereby sufficiently shown, and all who participate in the scheme would be guilty of conspiracy to use the mails to defraud, although they might not themselves make use of the mails. Preeman v. United States, supra. It is enough to show that the mails were used and that the scheme was one which reasonably contemplated the use of the mails. Spivey v. United States, 5 Cir., 109 F.2d 181.

The numerous letters, which were introduced in evidence, from Marshall to the investors; the form letters sent by him to the investment salesmen; his individual letters to many of the salesmen, and their correspondence in reply; the large stenographic force which was maintained; and the futility, even impossibility, of carrying on thousands of transactions, involving millions of dollars, dealing with hundreds of investors, and employing an army of salesmen, without the use of the mails in assisting in the operation, makes it incredible that all the appellants did not have actual knowledge that the mails were being used to further the scheme. If it appears that a scheme to defraud could not be carried out without the use of the mails, a jury is warranted, without further proof, in drawing inferences that those who participated in the fraud intended so to use the mails. See Farmer v. United States, supra. To take one instance only, the manner of operation of the scheme, requiring monthly and periodic checks to be sent out to several hundred investors in various cities, towns, and farming communities, in carrying out the continuing purpose of the project, could well justify the inference that the use of the mails was contemplated as essential and even indispensable in furthering the plan. It could not have been intended that these checks would be personally delivered each month to the investors, nor would that have been possible, unless the salesmen spent all of their time collecting checks at the main office, and then traversing the countryside to deliver them—all without remuneration and without any obligation to do so. That the use of the mails was contemplated is shown by the requests of salesmen that certain dividend checks be sent to them directly, so that they could make personal delivery to the investors; and one of the chief arguments used in persuading investors to convert to other contracts was that the less frequent payments would result in reducing the expenses of postage.

In any event, it was for the jury to determine whether appellants' intent that the mails should be so used was sufficiently shown; and the jury was warranted in drawing inferences that appellants were guilty of intent to use the mails in furtherance of the scheme. The evidence sustains the convictions for conspiracy.

However, certain of the convictions for violation of the Mail Fraud Statute call for reversal.

Appellant Secord was a salesman of cemetery lots, not for investment, but for burial purposes. On a certain occasion, he sold space for six graves, for burial purposes, for $60. At the time the purchaser bought the grave spaces, she also purchased 10 lots for investment, for $500. The circumstances of this sale are somewhat obscure. When Secord sold the grave spaces, he signed the contract as salesman. The transaction took place at the purchaser's home. Secord was apparently accompanied by Jones, an investment salesman. The investment contract was signed by Jones, who wrote in the space provided for the salesman's signature: "Paul Secord, by L. Don Jones." The purchaser testified in regard to the sale for investment: "Q. What did he (Secord) say to you about the return? A. Nothing in particular, only that if I made the investment you see I would receive some funds each month." She then stated that Secord told her that if a section was sold, she would receive $75. On cross-examination, she testified that Secord told her that she would get her returns as the lots were sold—and that she was to be paid back from the resale of her sections. Secord did not sign the contract, although that, alone, would not negative fraud. There were no representations made by him as to the safety of the investment, or any of the other representations heretofore recited as evi-

dence of fraud. None of the testimony, nor the extensive exhibits and records of the company, show that Secord was ever connected with any other investment sale during his association with the company, over a period of several years. Some years after the above transaction, when the projects had been terminated by legal action, and Marshall desired to procure a hall for a meeting of investors in a certain locality, in order to attempt a resuscitation of his scheme, he apparently communicated with Secord, who wrote him, stating that he had secured a place for the meeting and would contact as many people as he could in order to have a good crowd. He concluded by saying: "It surely will be wonderful if we can get going again." Marshall was represented by himself, and the investment salesmen, as a financial genius. Secord occupied the minor position of a lot salesman, stationed, apparently, at the cemetery. Undoubtedly, he thought it a distinction to perform a requested service for Marshall. Every reasonable inference indicates that Secord's letter referred, not to investment sales, but to his job selling lots for burial purposes (concerning which no fraud is claimed). He was not engaged in selling anything else during the entire life of the venture. Under all of the circumstances, the evidence was insufficient to support the criminal conviction.

Appellants Stott, Rucker, Cratty, and Willey were convicted of violation of the Mail Fraud Statute, but acquitted on the conspiracy charge. Rucker resigned from the venture by letter in March, 1936, and thereafter had no connection with the project. The testimony disclosed that Stott was not connected in any way with the scheme after April, 1935; Cratty, after July 9, 1936; Willey, after January, 1937. They were convicted on a count setting forth that, in furtherance of the fraudulent scheme, they mailed or caused to be mailed a letter, dated December 31, 1937. They were absolved from all other activity and connection with the scheme within the three-year period of limitations.

It was considered that the above-named appellants could be held as aiders and abetters of violation of the statute. The Mail Fraud Statute is harsh. Participation in a scheme, completely outside the cognizance of federal law, becomes ipso facto a federal crime if the mails are subsequently used in its furtherance, even though such use be incidental and without the consent, knowledge, or intent of the participants charged. The use of the mails carries back to the scheme and binds both together in criminal liability. The participation in the scheme cannot be said to link with the use of the mails, if such participation had ceased before the mails were used. To hold that a former participant, who had ended his association with the scheme long before the mails were used, is an aider or abetter in causing the use of the mails in furtherance of the scheme, would be too novel a construction of an already sufficiently extended application of criminal law. We must, therefore, conclude that the evidence does not implicate such appellants at the time when the letter, laid in the count on which they were convicted, was posted. "The crime consists in the posting of the letters (United States v. Young, 232 U.S. 155, 161, 34 S.Ct. 303, 58 L.Ed. 548), and if the defendant was not in the scheme when the letters were posted he was not a principal or an accessory to the crime then committed." Van Riper v. United States, 2 Cir., 13 F.2d 961, 967. In the cited case, it was held that the evidence did not support a conviction for violation of the Mail Fraud Statute, but that it did support a conviction on a count for conspiracy. In the instant case, the evidence did not implicate appellants in the scheme, at the time when the letter, set forth in the count on which they were convicted, was posted. The only ground for conviction, therefore, was conspiracy; and their acquittal on this count entitled them to a verdict of not guilty. See also United States v. Foster, D.C.Tex., 10 F.2d 577.

Error is claimed in the admission of evidence of certain communications made to Marshall, signed by one of the appellants, but not proved to have been sent through the mails. However, evidence that might have been inadmissible on the issue of using the mails to defraud might properly be admissible as throwing light on the manner of operation of the scheme and relationship of the parties therein, and as proof of intention to defraud. Furthermore, the rule that mere communications between alleged conspirators are not proof of a scheme or conspiracy to use the mails to defraud is not applicable where such communications are directed to advancing and effecting the conspiracy. A review of the record does not sustain the claim that

the admission of evidence of such communications was prejudicial or erroneous.

On the asserted error that the trial court excluded evidence of good faith with regard to a statement made by a prosecuting official to certain of the appellants in reference to an investigation which he had made, it appeared that such inquiry had been directed to ascertaining whether the perpetual-care funds were being misused and not to the nature and operation of the scheme. In any event, there was no semblance of proof that any such statements had influenced appellants. Refusal of the court to grant motions for bills of particulars and separate trials did not constitute error. Rubio v. United States, 9 Cir., 22 F.2d 766; Stumbo et al. v. United States, 6 Cir., 90 F.2d 828. We find no merit in the claim of error based upon alleged prejudicial comment and conduct of the trial court. In a jury trial lasting nearly seven months, the trial court was assiduous in protecting the rights of the accused; and it is remarkable that in such a complicated case no error is claimed as to any of the court's final instructions to the jury; nor does a review of the record substantiate any of the other claims of reversible error, based upon improper conduct of the trial.

In accordance with the foregoing, the convictions of appellants Secord, Rucker, Stott, Cratty, and Willey are reversed. As to all the other appellants, the judgment is affirmed.