Minerva **FIGUEROA**, Appellant,

v.

**UNITED STATES** of America, Appellee.

No. 19947.

United States Court of Appeals Ninth Circuit.

Nov. 3, 1965.

Rehearing Denied Dec. 10, 1965.

---

Wm. Bryan Osborne, Los Angeles, Cal., for appellant.

Manuel L. Real, U. S. Atty., John K. Van de Kamp, Asst. U. S. Atty., Chief, Crim. Div., J. Brin Schulman, Asst. U. S. Atty., Asst. Chief, Crim. Div., Robert H. Filsinger, Asst. U. S. Atty., Los Angeles, Cal., for appellee.

Before BARNES, BROWNING and DUNIWAY, Circuit Judges.

DUNIWAY, Circuit Judge:

Minerva Figueroa appeals from a judgment of conviction of a violation of 21 U.S.C. § 176a[1] following the guilty verdict of a jury. She was indicted on one count, reading as follows:

"On or about May 24, 1964, in Los Angeles County, within the Central

---

[1] " * * * whoever, knowingly, with intent to defraud the United States * * * receives, conceals * * * or in any manner facilitates the transportation, concealment * * * of * * * marihuana * * * knowing the same to have been imported or brought into the United States contrary to law * * * shall be imprisoned not less than five or more than twenty years and, in addition, may be fined not more than $20,000. * * *

"Whenever on trial for a violation of this subsection, the defendant is shown to have or to have had the marihuana in his possession, such possession shall be deemed sufficient evidence to authorize conviction unless the defendant explains his possession to the satisfaction of the jury."

Division of the Southern District of California, defendants MINERVA FIGUEROA, SILVIO CARLOS RODRIGUEZ-HERNANDEZ and ANDRES VALENZUELA-PEREZ, with intent to defraud the United States, knowingly received, concealed and facilitated the transportation and concealment of 89.8 kilograms of marihuana, which said marihuana, as the defendants then and there well knew, theretofore had been imported and brought into the United States contrary to law."

 The sole ground of appeal is that the evidence is not sufficient to sustain a judgment of conviction.[2] In such a case "the correct test is whether 'reasonable minds could find that the evidence excludes every hypothesis but that of guilt.'" Kaplan v. United States, 9 Cir., 1964, 329 F.2d 561, 563. In considering the question we must, of course, view the evidence, taking into account reasonable inferences which may be drawn from it, in the light most favorable to the government. Glasser v. United States, 1942, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680.

In April, 1964, Valenzuela and Rodriguez, together with one Ernest Venero and one Israel Dagneses-Alayon and another person not identified, met in the apartment of Valenzuela at 2300 Bellevue, Los Angeles. Dagneses was given $50 by Valenzuela to put four tires on Dagneses' car. On May 12, Dagneses, Rodriguez and Venero met on the roof of the house where Venero and his parents had an apartment. Dagneses told Venero that the tires were on the car so that it was ready to be taken away to New York. Venero said that Dagneses should wait for Venero because the material (marihuana) "was there already." This conversation was observed but not heard by a federal narcotics agent. The three men were together for about 10 minutes. There were other occasions between May 12 and 17 when federal agents observed Valenzuela and Venero together. There was also one occasion during this period when appellant was seen at a restaurant with Valenzuela. There were also occasions on which Venero was seen driving a car belonging to Rodriguez.

On May 12, 1964, Valenzuela and appellant rented an apartment at 1469–2/5 Scott Street. Appellant asked to see the apartment and the two of them then looked at it and said that they would take it. Valenzuela said they particularly wanted a garage. They gave the name of Mr. and Mrs. Mena and Valenzuela paid a month's rent, $70 for the apartment and $5 for the garage. A few days later they moved some furniture into the apartment. Thereafter the landlady saw them there occasionally and they asked her if the electricity or gas man had been there because they had paid in advance for those utilities. In fact, they had not. Appellant was not married to Valenzuela and during the period in question was living at 118 North Parkview Street, Los Angeles. Valenzuela had an apartment at 2300 Bellevue; Rodriguez at 124 Westmoreland.

On May 23, 1964, at about 4:30 P.M., Valenzuela, Venero, and Dagneses were seen in a 1957 Ford station wagon belonging to Dagneses. After a few minutes, Valenzuela and Dagneses, the former driving, drove the car to the residence of Dagneses where they removed the jump seat from the rear. They then drove the car to 1469 Scott Street and went into apartment No. 1469–2/5. There they met an unidentified man and the appellant, who was not theretofore known to Dagneses. She was sitting in a chair. Valenzuela asked the unidentified man how many packages were in the garage. The answer was "80, 90 pack-

**2.** Appellant also appears to object to the admission of certain evidence, but since she failed to comply with Rule 41(e), F.R. Crim.P., failed to preserve the point for appeal, and failed to comply with Rule 18(2)(d) of the Rules of this court and since in any event the admission of the evidence is not plain error, Rule 52(b), F.R.Crim.P., the objection is not properly before this court.

ages." Valenzuela said that the weight was not complete. The man said that there were 90 packages and that the weight was complete. Valenzuela then took a lantern and said "let's go underneath." Appellant took no part in the conversation.

Valenzuela and Dagneses (but not appellant) proceeded to the garage and put "the material" in the car. Each parcel was wrapped in brown paper and transparent paper (tape) to close it together, and was shaped like a football. The parcels were placed in the back of the car and covered with a blanket. Valenzuela and Dagneses then got in the car, Valenzuela driving, and went to the parking lot at Queen of Angels Hospital, on the 2300 block on West Bellevue, where they left the car, arriving there between 4 and 5 in the afternoon. Valenzuela twice checked the car during the night—once at 10 P.M. on the 23rd and again at about 2 A.M. on the 24th. A federal agent looked into the car and saw that the back part was covered with a blanket under which were a number of irregular objects. He could see portions of a few of the parcels and their shapes.

On May 24, at about 8:45 A.M. appellant and Rodriguez entered the parking lot on foot and proceeded to the station wagon. Rodriguez got into the driver's seat and appellant on the passenger's side of the same seat and they drove to 1469 Scott Street, driving past the apartment and then making a U turn and coming back, driving into the garage, the door of which had been left open all night. They arrived at about 9:20 A.M. Both of them got out of the car and Rodriguez closed the garage door. Appellant asked the landlady if the landlady had seen her husband and was told that she had not. The two of them entered apartment 1469–2/5. At about 10 A.M. appellant left the apartment, walked to the garage and handled the lock. She crossed the street and looked back toward the apartment, walked back to the apartment and again handled the lock. Before touching the lock, she looked up as though she were talking to someone. She then walked away.

At about 10:15 a yellow cab arrived in which Valenzuela was a passenger. He went into the apartment and in a few minutes came out with two heavy foot lockers which were placed in the trunk of the cab. Valenzuela got in the cab which then drove off. After the cab left, appellant again returned and touched the lock. She looked up and asked the landlady if she had seen her husband. The landlady told her that he had just left in a cab. Appellant again left, saying she was going home to her mother and wait. The cab proceeded to the bus station at Anaheim, California, where Valenzuela was arrested and the foot lockers were found to contain bricks of marihuana. The agents then returned to the apartment on Scott Street, searched the Ford station wagon and found 81 parcels of marihuana wrapped in a shape described as that of a football.

Shortly after May 24 the landlady went into the apartment. She found certain furniture, but no utensils, no food, no bedding and no clothes. The landlady testified "I don't think they lived there. They just came and went. I don't think they stayed there."

■ There was no proof either that the marihuana had been imported into the United States or that appellant knew that it had been imported. Thus appellant's conviction can be sustained only if there is sufficient evidence that she had the marihuana in her possession. The court so instructed the jury in a manner that was satisfactory to appellant's counsel, and appellant's counsel's argument was devoted primarily to an effort to persuade the jury that there was not sufficient evidence that appellant had possession. Motions for acquittal on this ground were made and denied.

As is often the case where more than one person is charged with a violation of section 176a or section 174, the case was tried in much the same manner as that in which a conspiracy case is tried and the emphasis by the prosecutor was on

appellant's apparent participation in a scheme to conceal and transport the marihuana, rather than upon her having possession of it. We have heretofore held that the so-called presumption embodied in the statute cannot be used to impute possession to one who is a party to a conspiracy to violate the section, and that even as to a conspirator it must be shown that he had custody or control over the drug. In the same case we also held that such a person cannot be held guilty as an aider or abettor under 18 U.S.C. § 2. Hernandez v. United States, 9 Cir., 1962, 300 F.2d 114. However, we also recognized in the Hernandez case, as we have in many others, that possession, which is equivalent to power to control, does not require that the drug be within the immediate physical custody of the defendant, that possession need not be exclusive but may be joint, and that constructive possession is sufficient. In that case we also said:

> "In most prosecutions under Section 174, conviction rests ultimately upon proof that defendant had 'possession' of the narcotic drug. The term must be defined with precision and restraint for in effect we are defining the basis upon which punishment will be imposed. It is well to be reminded, too, that the term 'possession' is a highly ambiguous one in the law, and hence 'so fraught with danger that the courts must scrutinize its use with all diligence * *.' Guevara v. United States, 242 F.2d 745, 747 (5th Cir. 1957)."

■ The question is this: Does the evidence in this case show that appellant had the requisite possession of the narcotic? We have no doubt that if possession were not an element of the offense the jury could readily have convicted appellant of concealing or facilitating the transportation or concealment of the drug. Whether she could be found to have had possession is a closer question. But after careful study of the evidence we are convinced that there is sufficient to sustain such a finding. Appellant is not in the position of the defendant whose conviction was reversed in the Hernandez case, for there the court expressly found that the defendant did not have possession. She is not in the position of the defendant whose conviction was reversed in Arellanes v. United States, 9 Cir., 1962, 302 F.2d 603. There the defendant in question was the wife of the man who clearly had possession. The only evidence to sustain a finding that she had possession was that she was his wife, living with him, and a passenger in a car driven by him in which the narcotics were found. As the court there said, her presence "is as fully explained by her attachment to her husband as it might be by her control over the drugs." Delgado v. United States, 9 Cir., 1964, 327 F.2d 641, is distinguishable for similar reasons. Other cases cited are even less in point. In this area of the law, each case must turn on its own peculiar facts, in the light of the principles announced in the decisions.

■ Here, appellant was not married to Valenzuela. She participated with him in renting the apartment, but they did not live together there. The jury could infer that the apartment was rented only as a place in which to receive and conceal narcotics. Neither Valenzuela nor she had any interest in the automobile that was used to transport the narcotics. It belonged to Dagneses, whom she did not know. It was brought to the apartment by Valenzuela and Dagneses, not by Rodriguez. She was not married to Rodriguez and so far as appears had no relation to him apart from his participation in the crime, yet she accompanied him to the parking lot and to the car. It had been loaded with a large quantity of marihuana at the apartment that she rented, after a conversation about the marihuana that she had heard, but that Rodriguez had not. She drove with Rodriguez in that car back to that apartment. There she did a little "covering up" with the landlady and three times made sure that the garage in which the car was parked was locked. A jury could find, we think, that her behavior indicates an active association with the enterprise, that she knew the marihuana was in the garage

and in the car, that possession of the apartment and garage and their contents was joint by her and Valenzuela, and that during the transportation of the narcotic from Queen of Angels parking lot to the apartment, her possession of the car and its contents was joint with Rodriguez. The test is not whether we would have found her guilty but whether a reasonable jury could have done so, and we think that it could.

Affirmed.