**F. Darold WINDSOR, Appellant,**

v.

**UNITED STATES of America,
Appellee.**

**No. 19174.**

United States Court of Appeals
Ninth Circuit.

Sept. 15, 1967.

Pope, Circuit Judge, dissented.

Michael J. Hemovich, Bantz, Hemovich & Schultheis, Spokane, Wash., for appellant.

Sylvan A. Jeppesen, U. S. Atty., Boise, Idaho, for appellee.

Before POPE, HAMLEY and MERRILL, Circuit Judges.

MERRILL, Circuit Judge:

Appellant (with certain codefendants) stands convicted of mail fraud and conspiracy to commit mail fraud. 18 U.S.C. §§ 1341, 371. There is no question whatsoever of his involvement in an unsavory, high-pressure, fly-by-night scheme for the promotion of land sales. The dispute which this case presents is whether he was a party to or aware of that conduct of his codefendants which elevated this exercise in *caveat emptor* to the level of an outright swindle. The question upon appeal is whether the record supports his conviction.

Appellant is an attorney practicing in Portland, Oregon. In May, 1962, he drew up and filed articles of incorporation for Consolidated Homes Corp., an Oregon corporation. Two of his codefendants were among the incorporators and officers. The headquarters and mailing address was appellant's Portland office.

Lake Coeur d'Alene is located in the panhandle of Northern Idaho, which still boasts substantial areas of untouched countryside. Upon this Eden, Consolidated Homes Corp. descended in classic confrontation of free enterprise with unguarded natural resource. Operating under the trade name of Lakeview Estates, the entrepreneurs proceeded in the following fashion:

1. A twenty-acre tract of lake view property was acquired by contract, largely on credit (one fifth cash).

2. A civil engineer was employed (on credit) to survey the property and prepare a subdivision plat for recording (which was never recorded).

3. A bulldozer operator was employed, largely on credit (three eighths cash), to rough out the roads.

4. Two Portland taxicab drivers (also codefendants) were secured to act as sales force.

5. An office was rented in Coeur d'Alene (for three months).

6. Typists were employed (largely on credit) to prepare over 12,000 bait letters with which Spokane, Washington, and nearby sections of Idaho were flooded. Appellant participated in preparing the letters which showed his Portland office as "Home Office." The addressees (whose names had been secured from telephone directories and auto registration lists) were advised that their names had been "recommended to our advertising department" and were invited to buy an "advertising tract" of at least 60 x 132 feet for $89, and promised a warranty deed for this amount.

7. When a prospect arrived at the local office the sales force took him in hand. He was shown the $89 lots, discouragingly located in the poorest corner of the tract; was advised that the price did not include improvements, for which assessments remained to be levied; and was encouraged to buy a more desirable lot with improvements included (discussed later) priced at from $748 to $2587 (after a discount of $300 for presenting the letter), the average being about $1500, payable $89 down and $20 a month.

8. In October, 1962, less than three months after the selling campaign began, the purchasers were sent a letter advising that the subdivision was sold out; that the local office was closing; that further correspondence should be with the "Home Office" and that payment in full by November 1 would earn 10 per cent discount.

9. Shortly, an advertisement appeared in a Spokane newspaper offering the land contracts at "substantial discount."

10. The entrepreneurs moved out and the postal inspectors, in due course, moved in.

Appellant's connection with all of this is clear. While he remained in Portland and aloof from the activities at Coeur d'Alene, he handled the paper work—the correspondence, the contracts and such deeds as were drawn. The contracts provided:

> "It is understood and agreed that there are no terms or conditions to this sale, other than those appearing in writing in this contract."

No improvements were mentioned. When protests resulted a "rider" was added by appellant which promised water, electricity and "all-weather roads" at such time as the purchaser built a home of "approved character" on the lot. How such a home was to be built without adequate access, water or electricity is not discussed.

However, as to these details of *modus operandi* in which appellant participated or as to which he was apparently aware, there was no proof that promises were fraudulently made or debts fraudulently incurred. The interest of the postal inspectors was aroused by complaints relating to oral representations made by the Coeur d'Alene sales force. All customers were promised not only water and electricity, but paved roads. Many were promised asphalt roads with cement curbs, a water system with filtration plant and six-inch mains, fire hydrants, gas mains, street lights, sidewalks, removal of trees and of an old building which blocked the view. Some customers were told that contracts had already been let for some of these improvements, and some were told that the cost had already been paid. Most were simply promised completion dates ranging from the fall of 1962 to the spring of 1963. The record is clear that there never was intent to meet any of these promises.

There is nothing but speculation to connect appellant with these on-the-scene representations. His knowing participation in a scheme to defraud is an essential part of the Government's case. Phillips v. United States, 356 F.2d 297 (9th Cir. 1965), cert. denied, Walker v. United States, 384 U.S. 952, 86 S.Ct. 1573, 16 L.Ed.2d 548 (1966). This element may be established circumstantial-

ly, but cannot be based on so-called "constructive" knowledge because of facts known to others with whom appellant was involved in this scheme. Id. at 303. A study of the record convinces us that the extent of his proved participation is as consistent with lack of knowledge as it is with knowledge. He, in fact, never went to the Coeur d'Alene site. While he ultimately received knowledge of the representations through complaints arriving at the "Home Office," this was after the selling campaign had been concluded.[1]

The Goverment, then, has failed to meet its burden of establishing the criminal intent essential to the crime of mail fraud.

Reversed.

POPE, Circuit Judge (dissenting).

The court lists at least ten details of the plan or scheme in which the appellant participated. Because he is an attorney he drew up and filed articles of incorporation for Consolidated Homes Corp., whose incorporators and officers were two codefendants; he prepared and handled all the contracts for acquiring the property which was to be used as the basis for the sales; he drew up the. contracts and deeds on sales. He knew the contents of what the court terms "bait" letters, 12,000 of them, which he admitted being "a fast sales gimmick" and he knew the contents of a later letter sent to purchasers advising that the subdivision was sold out when the plot began to fold up. Further, when it appeared that some of the prospective purchasers were bothered about lack of promised improvements, appellant added a "rider" to the contract which glibly promised water, electricity and "all-weather roads" at such time as the purchaser built a home of "approved character" on the lot. As to this the opinion says: "How such a home was to be built without adequate access, water or electricity is not discussed."

The opinion finds that "Appellant's connection with all of this is clear. There is no question whatsoever of his involvement in an unsavory, high-pressure, fly-by-night scheme for the promotion of land sales." However, it concludes that as to the details of the *modus operandi* in which appellant participated or was aware, there was no proof that promises were fraudulently made or debts fraudulently incurred and that although in the oral representations made by the Coeur d'Alene sales force the "record is clear that there never was intent to meet any of these promises" "there is nothing but speculation to connect appellant with these on-the-scene representations."

It is difficult to understand the court's conclusion that there is nothing but speculation to connect appellant with the "on-the-scene" representations when all the proof here points to the fact that appellant was one of the prime movants in the enterprise; that he had actual and not only constructive knowledge of the nature of the scheme. There was knowing participation of the appellant from the beginning to the end; and, although the record may show, as the appellant claims, that he made no verbal statements

---

1. We cannot accept the chronology of events inferred by the dissent. Appellant's acknowledgement to Postal Inspector Burnett, to which the dissenting opinion refers, occurred two years after the fact. It was established by testimony of the postal inspector with reference to notes taken by him of conversations had with appellant. The inspector testified: "There is another point here that I have quotation marks around. 'Originally was to gravel street. I heard some people were told by salesmen that streets would be blacktopped but that was not contemplated.'" The notes thus bear out appellant's assertion that such representations, made on the ground, were unauthorized; but, further, in no way does it appear *when* appellant learned of this particular representation. In light of the completion dates promised, it hardly seems likely that complaints respecting lack of performance would have arrived at the home office while the selling campaign was still in progress. Complaints respecting sufficiency of the contract of sale, as a result of which the rider was added, are not spelled out and were apparently satisfied by the provisions of the rider.

to any one, participation in the scheme here did not require him to make any.

As for appellant not knowing about the "on-the-scene" representations, appellant acknowledged to Postal Inspector Burnett that he "heard some people were told by salesmen that streets would be blacktopped but that was not contemplated"; however, he did nothing to stop these representations but he did add a "rider" to the contract which supplied the necessary promises. Further, another letter was sent out which was used to answer anticipated inquiries about promised improvements which was signed by the secretary-treasurer for Consolidated Homes pursuant to her instructions from appellant. Since it was shown at the trial that the appellant had intimate knowledge of all written aspects of the scheme it was proper for the trial judge to infer that appellant had heard of the complaints and had prepared an answer to them accordingly.

The trial judge was also satisfied that appellant's legal talent was used to artfully draw the contracts which the purchasers were induced to sign so that they did not bind the defendants or any one else to construct any improvements.

I think that the very language of the court's opinion acknowledges the appellant was a party to and aware of the conduct of his codefendants. The rider which it says the appellant added to the contract was placed there after it was found necessary to make more promises in order to conclude a sale. The appellant had knowledge and was aware that no engineering surveys had been made to determine the means of obtaining water or providing a community water system in Coeur d'Alene and the trial court could reasonably infer from this that there was

never any intention on the part of the corporation to construct the promised improvement; that appellant knew there was no such intention and that the addition of the rider was to further deceive.

The trial judge had an abundance of uncontradicted testimony to convince him that the appellant was one of the principals in this enterprise. In discussing the "bait" letter which was sent to all prospective purchasers of lots, in answer to questions concerning its origin, appellant's secretary testified that it was basically the same form letter used in other land sales promotions in which appellant was involved and that appellant and his co-defendant "did it".[2]

These letters were not signed by any officer of the company but they were signed by one "J. Bean". The secretary testified that she knew of no such person. However, another witness, Mrs. Louise Cope, who was employed at the Coeur d'Alene office to do clerical work, was uncontradicted in her testimony as follows: "Q. What name did each of these three defendants [Carl Kingston, Bertil Olsen and John Griebel] sign to these advertisements? MR. HEMOVICH: I am not sure this witness said each of the three defendants signed them. THE WITNESS: Yes, I did. MR. HEMOVICH: I am sorry. A. J. Bean. Q. The same name that is shown on Plaintiff's Exhibit No. 5? A. Yes."

This was sufficient to satisfy the trial judge that the defendant certainly knew that these were not only bait letters but that they were going out bearing the signature of a non-existent person which suggested an intent to defraud somebody and a lack of responsibility.

2. Her testimony was as follows: "Do you recall a conversation with Mr. Windsor in regard to such a form in about May of 1962? A. Where it came from is that what you mean? Q. Yes, do you recall such a conversation with Mr. Windsor? A. Yes. Q. Who was present and where was it? A. This was in the office in Portland and he and I were the only ones present. Q. What was the conversation, what were the circumstances and what was the conversation? A. The circumstances were that —well, Mr. Windsor showed me one of these letters for the Richland development and I read it. I said, 'Where did it come from—' no, I said 'who did it?' He said, 'We,' and I said 'who is we?' He said, 'Ray.' "

The trial judge was also satisfied that appellant's interest in the outcome of this venture was a financial one. There was uncontradicted testimony that appellant had a one-fourth interest in the enterprise. His secretary, who was also secretary-treasurer of the corporation which he had created, testified: "Q. Who were the parties having an interest in the Lakeview Estates? A. You mean all the parties involved? THE COURT: A financial interest is the question. A. Well, Mr. Robertson and Mr. Windsor and Mr. Griebel and Mr. Skelton. Q. What were the shares of that interest—the amount of interest of each of them in the company? A. Well, one-fourth each. Q. Each of them had one-fourth interest? A. Yes."

There was also testimony that salary checks were mailed to Mr. Windsor's office and they were either signed by Mr. Windsor, Mr. Robertson or Mrs. Baker.

There was testimony from the appellant himself that he held office in the corporation as president and that he had been appointed as such after a board of directors meeting of which he and his codefendant, Mr. Robertson, formed a quorum. This would indicate to the trial judge that appellant was a director of the corporation.

That Windsor was aware of complaints being made was made known to the trial judge. The secretary, Mrs. Baker, testified that her office received letters from purchasers indicating their dissatisfaction. When asked as to whether there were any indications that Windsor had dishonorable intentions in the matter she said: "I never asked him one way or the other. I assumed that they were." And when asked whether anything gave her any indication to the contrary, other than the investigation and the postal investigator, she said: "In answer to that question there were a few thoughts in my mind when we did receive letters from purchasers when they said they were not as satisfied as I thought they should be." She also testified: "Q. * * * so far as you knew everything appeared to you to be aboveboard, and you in your answer mentioned other than having a few things in your mind upon receiving letters from purchasers; and I will ask you what those few things you had in your mind after receiving those letters from purchasers were? A. When we received a letter from the purchaser and they were disturbed about what they had really purchased, I wondered if they had anything to be disturbed about." It is obvious that it was pursuant to these complaints that the rider was added by the appellant which, as is stated in the majority opinion, "promised water, electricity and 'all-weather roads' at such time as the purchaser built a home of 'approved character' on the lot." As the opinion further suggests this is an absurd rider that a home be built without adequate access, water or electricity. At any rate, it was by the secretary under the direction of Windsor and in his office that the rider was prepared.

Although appellant testified that he had nothing to do with any mailings, particularly Exhibit No. 5 which is the advertising letter here referred to as the "bait letter", he also testified that he was familiar with it; he termed it "a fast sales gimmick"; he knew that the salesmen must have exaggerated the improvements to be made; he knew that the purchasers of the property in Coeur d'Alene were not entitled to better roads nor were they entitled to water and he knew that it was planned to gravel the roads and no mention was made of blacktopping them. There was sufficient contradictory testimony from which the court could infer that appellant was not telling the truth.

Although the evidence indicated otherwise appellant testified that his only participation in this scheme was in his position of an attorney. But even as an attorney, if he participated in a scheme by advising and supervising the commission of an illegal act, this would not excuse him. While an attorney may properly defend others when they are charged with having committed a crime, members of

the bar have no professional right to immunity or privilege from prosecution for having assisted, counselled or advised others in committing that crime. Baird v. United States, 8 Cir., 196 F. 778, 779.

As I understand the majority opinion, there was sufficient evidence here to convince the trial judge that there was a scheme to defraud and that the mail was used to further that scheme. This case is controlled by the rule in United States v. Press, 2 Cir., 336 F.2d 1003. Press held that where members of an alleged conspiracy had received knowledge that customers were being misled by solicitation literature and there was general dissatisfaction with the manner in which defendants were conducting their affairs, continued operation despite this knowledge showed the existence of a scheme to defraud. The court there said (p. 1011): "But evidence that there had been complaints which were called to appellants' attention was relevant on the issue of appellants' intent and good faith. The inference might readily be drawn that, since appellants knew that members were being misled by solicitation literature and that there was general dissatisfaction with the manner in which * * * conducted its affairs, continued operation despite this knowledge showed the existence of a scheme to defraud." The effect of the majority opinion in the instant case is to refute the Press doctrine. There was sufficient evidence before the trial court to support the inference of knowing participation of appellant to bring him within the Press rule.

Furthermore, the fact that appellant may not have been personally involved with the details of the scheme, although it is more than evident that he was, is not a defense to the charge of conspiracy. See Silkworth v. United States, 2 Cir., 10 F.2d 711, 717: "One man may form and accomplish it, with or without assistance; but all who with criminal intent join themselves *even slightly* to the principal schemer are subject to the statute, although they may know nothing but their own share in the aggregate wrongdoing." (Emphasis added.) See also

Blue v. United States, 6 Cir., 138 F.2d 351, 359.

In reversing a conviction after trial without a jury, we must apply the test of "whether reasonable minds could find that the evidence excludes every hypothesis but that of guilty" and we must view the evidence in the light most favorable to the government. Figueroa v. United States, 9 Cir., 352 F.2d 587, 589. I cannot justify the conclusion that a man who was as involved in the organization and administration of a scheme such as this could not have held the necessary criminal intent essential to the crime of mail fraud.

I would affirm the judgment and conviction of the district court.