## OLSEN et al. v. UNITED STATES.

(Circuit Court of Appeals, Second Circuit. December 7, 1922.)

No. 42.

1. **Post office ☞49—Evidence held to support conviction for using mails to defraud.**

   Evidence *held* to sustain a conviction of defendants for using the mails in carrying out a scheme to defraud.

2. **Post office ☞48(4)—Indictment for using mails to defraud held sufficient.**

   An indictment under Criminal Code, § 215 (Comp. St. § 10385), charging that defendants, having devised a scheme to defraud, for the purpose of executing such scheme placed in a post office of the United States a letter, inclosed in a postpaid envelope and addressed to a person named, *held* not insufficient because it failed to allege that the letter was "to be sent or delivered by the post office establishment of the United States."

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**3. Post office ⬤=35—Using mails to promote frauds.**

Under Criminal Code, § 215 (Comp. St. § 10385), making it an offense to use the mails to promote a scheme to defraud, the gist of the offense is the mailing of a letter in execution of the scheme.

**4. Indictment and information ⬤=110(58)—Indictment for using mails to defraud need not follow language of statute.**

An indictment under Criminal Code, § 215 (Comp. St. § 10385), for using the mails to defraud, need not follow the language of the statute, but is sufficient if the averments bring the charge within the substance and true meaning of the statute.

In Error to the District Court of the United States for the Southern District of New York.

Criminal prosecution by the United States against John J. Olsen and Elly Z. Parker. Judgment of conviction, and defendants bring error. Affirmed.

Baker & Obermeier, of New York City (Leonard J. Obermeier, of New York City, of counsel), for plaintiffs in error.

William Hayward, U. S. Atty., and G. Tarlton Goldthwaite, Sp. Asst. U. S. Atty., both of New York City.

Before HOUGH, MANTON, and MAYER, Circuit Judges.

MANTON, Circuit Judge. The plaintiffs in error, together with the Cuprite Esmeralda Sulphur Company, Nicholas P. Theo, and Robert M. Charlton, were indicted on seven counts for the crime of the unlawful use of the mails in a scheme to defraud, and on the eighth count, for a conspiracy to commit an offense against the United States. A severance was ordered as to the defendant Theo, a dismissal was directed against the defendant Charlton, the corporation was acquitted by the jury, and the plaintiffs in error were found guilty on the eight counts and each sentenced to serve a prison term.

The first seven counts of the indictment were under section 215 of the Criminal Code (Comp. St. § 10385), and the eighth count under section 37 of the Criminal Code (Comp. St. § 10201). Section 215 makes it a crime for one—

"having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, * * * shall, for the purpose of executing such scheme or artifice * * * place, or cause to be placed, any letter * * * whether addressed to any person residing within or outside the United States, in any post office, or station thereof * * * of the United States or authorized depository for mail matter, to be sent or delivered by the post office establishment of the United States. * * * *"

Section 37 provides that, if two or more persons conspire either to commit an offense against the United States or defraud the United States in any manner or for any purpose, and one or more of such parties do any act to further the object of the conspiracy, each of the parties to such conspiracy shall be fined or punished.

[1] The evidence adduced proved that, with the aid of the individual defendants named, there was organized and promoted the cor-

⬤=For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

poration indicted. Parker was elected vice president; Olsen, secretary and treasurer. J. J. Olsen & Co. was a partnership and made a proposal to the corporation, which was accepted, by the terms of which the partnership agreed to transfer its interests in 14 mining claims to the company for a purchase-money mortgage, notes, and shares of the company's capital stock. Some of these shares were issued to Theo, who was elected president, and this stock remained in escrow, while 300,000 shares were issued to Olsen, to remain in escrow with the company until December, 1918. An employé of J. J. Olsen & Co. had an option of 18 months on 500,000 shares of this stock, which was to remain and be transferred to the purchasers by the Security Transfer & Registrar Company, and out of the proceeds the company was to be paid, for its corporate use and purposes, 30 cents per share for the first 100,000, 40 cents a share for the second 100,000, and 50 cents per share for the remainder. The balance of the proceeds was to be paid to the employé or his assigns. Olsen took an option to purchase 14 mining claims in Cuprite, Nev., from the defendant Theo, of Goldfield, Nev., and the latter agreed to convey title to said 14 claims to Olsen, or the corporation formed, and he agreed to pay $2,000 in cash on the execution and delivery of the agreement, $1,000 on February 25, 1918, $10,000 on November 15, 1918, $10,000 on April 15, 1919, and $12,000 on February 15, 1920. Olsen procured $3,000 to make the initial payment and delivered to Theo $200,000 worth of stock certificates, which was one-fifth of the capitalization of the corporation formed under the laws of Nevada. Title to the 14 claims was to be conveyed to the corporation upon its formation, within 30 days from the date of executing the agreement and the delivery of the proper deeds conveying full title, and Theo was to secure a mortgage upon the properties.

Originally Theo and Olsen took an option to purchase these claims for $35,000, and subsequently this was transferred to the corporation. Olsen's price to the company was $32,000 and a block of the stock. The only cash received was $3,000, an initial payment made by Olsen to Theo. A prospectus was printed, which was extensively circulated through the mails. It stated that the management of the company was composed of experienced and successful mining operators, who in the past had been responsible for the building of other sulphur mining enterprises, and their practical experience would prove invaluable in guiding the destinies of the corporation to complete success. It added that the directors were men of high standing in the business world, and the fact that they constituted the directorate was conclusive evidence of their faith in the future of the company. In the prospectus there appeared an undated report of A. P. Theo, president of the company. No mining engineer was called upon by the defendants to make a report on the property. The plaintiffs in error, after forming their partnership, entered into a stock-selling campaign. The exhibits contained various letters and circulars in a publication known as the "Financial Index," which was sent through the United States mails to persons who afterwards became purchasers of the stock and victims of the scheme. Letters were mailed in executing their plan of sale,

and each of the victims named in the indictment were called as witnesses, and gave testimony as to the payment of money in return for stock which proved to be worthless.

The evidence is sufficient to support the verdict of the jury, as presented by the government, that the scheme was a fraudulent one. There is testimony that representations were made by the defendants that they had "practically a mountain of sulphur—great deal of pure flour sulphur"; that "it required very little work to get it out and transportation facilities were very easy"; that "cars ran down the incline of their own accord"; that "the stock would advance greatly in value in a short period," and "we are prepared to deliver upon reasonable notice up to 300 tons of unrefined sulphur ore daily, based on the pyrites basis of $15 per ton for 50 per cent. sulphur ore." A mining engineer testified that he made an examination of the property, that the titles were defective, and that the property while containing sulphur, did not contain sulphur in sufficient content and advised a prospective investor against investing any money in the scheme. Plaintiff in error's "Financial Index" stated that:

"The mountain is practically honeycombed with these sulphur deposits, and the numerous tunnels that have been driven into the mountain for exploration and measurement purposes have almost invariably worked in the sulphur from the grass roots. It is possible to scrape off a few inches of dirt on the top of the mountain and expose large sulphur deposits. It is the management's intention at the earliest practicable moment to install steam shovels and operate much as the Utah copper property is operated. The sulphur will thus be produced at the expense of a few cents per cubic yard. The present explorations and developments have exposed between 15,000 and 20,000 tons of high grade sulphur ore, but a reasonable miner's measurements would indicate that there are many times the quantity of sulphur available."

It was stated that the property referred to was between two railroads. It appears that such was not the case. There was a station at Cuprite on the Bullfrog Gold Field Railroad, and the town of Ralston was on the Las Vegas & Tonopah Railroad. Trains were discontinued in 1916 on one line, and operations ceased on the other in 1917, due to a flood which washed out the spur track, and the track was never rebuilt. After March, 1918, there was only one railroad operating in the neighborhood of Cuprite. The first tunnel was 200 feet long; there were communications between the first and second tunnels. The hill where there were found workings of the mine is not the hill represented in the picture of the prospectus. It is a view behind the railroad station and west of the hill in the picture of the prospectus.

The plaintiff in error Olsen admitted that the company was unable to make the first payment on the option, and Theo foreclosed, and the company lost its interest in the property. The total number of shares of stock issued to persons out of the original 125,000 shares was issued to Olsen & Co., and no money was paid for this stock; 11,333 shares were issued in the name of one Collins, and in December, 1918, there were 10,630 shares of treasury stock approximately outstanding. For this stock the company received $393. That was all the company received from the sale of any stock, and at the time of the trial there was a balance of $7.95 in the treasury of the Security Transfer & Reg-

istrar Company to the credit of the corporation, and 310 shares were issued against a cash consideration, and 11,333 were issued without consideration.

A mining engineer called by the government made an investigation of the property, and gave testimony that sulphur deposits were very much misrepresented, and did not exist in such unlimited quantities, or, indeed, in anything near the quantities, as represented by the defendants. Indeed, from the testimony of the government expert called, there was little sulphur in the vicinity of Cuprite. These facts required the submission of the evidence to the jury as to whether or not the defendants had devised or intended to devise a scheme or artifice to defraud for obtaining money or property by means of such false or fraudulent representations or promises; and the good faith and honest intent of the defendants were also for the jury, and with their verdict we cannot interfere.

[2] Errors are assigned upon which a reversal of the judgment is sought. The first alleges error in denying the motion to quash counts 2, 3, 4, 5, 6, and 7 of the indictment, because of the omission to plead in the indictment the statutory words "to be sent or delivered by the post office establishment of the United States." The first count of the indictment alleged an offense in the following language:

"And within the jurisdiction of this court, for the purpose of executing the said scheme and artifice and attempting so to do, unlawfully, knowingly, and feloniously place and cause to be placed in the post office of the United States, to wit, the post office in the city and county of New York, in the Southern district of New York, to be sent and delivered by the post office establishment of the United States to the addressee thereof, a certain letter inclosed in a post-paid envelope addressed to," etc.

In the second, third, fourth, fifth, sixth, and seventh counts of the indictment, another instance of having sent a letter for the furtherance of the same scheme is alleged, and the language of each as to the use of the mails is in the following phrase:

"The defendants, so having devised and intending to devise the aforesaid scheme and artifice for the purpose of executing said scheme and artifice and attempting so to do, did unlawfully, knowingly, and feloniously place and cause to be placed in a post office of the United States, to wit, the post office in the city and county of New York, in the Southern District of New York, in the Hudson Terminal Station thereof, a certain letter inclosed in a postpaid envelope addressed to * * *, against the peace of the United States and their dignity, and contrary to the form of the statute of the United States in such case made and provided (section 215, U. S. C. C.)."

[3] The mailing of a letter in the execution or attempted execution of a fraudulent scheme is the gist of the offense denounced by the statute. It is that act, and that alone, which confers jurisdiction upon the courts of the United States to punish authors of fraudulent schemes. Lemon v. U. S., 164 Fed. 957, 90 C. C. A. 617. In Durland v. United States, 161 U. S. 306, 16 Sup. Ct. 508, 40 L. Ed. 709, the Supreme Court said:

"We do not wish to be understood as intimating that, in order to constitute the offense, it must be shown that the letters so mailed were of a nature calculated to be effective in carrying out the fraudulent scheme. It is enough if,

having devised a scheme to defraud, the defendant, with a view of executing it, deposits in the post office letters which he thinks may assist in carrying it into effect, although in the judgment of the jury they may be absolutely ineffective therefor."

It is only necessary that the scheme should be devised or intended to be devised and the letter be placed in the post office for the purpose of executing the scheme or attempting to do so. The elements of the offense are, first, the scheme devised or intended to be devised to defraud or for obtaining money or property by means of false pretenses; and, second, for the purpose of executing such scheme, or attempt to do so, the placing of any letter in any post office of the United States to be sent or delivered by the post office establishment. United States v. Young, 232 U. S. 155, 34 Sup. Ct. 303, 58 L. Ed. 548.

[4] We think the omission of the words "to be sent or delivered by the post office establishment," in the counts above referred to, is not fatal to the indictment. It is sufficiently alleged that each of the letters in question were placed in a post office of the United States inclosed in a postpaid wrapper addressed to each person referred to in the several counts, and this is a sufficient charge that it was to be sent or delivered, within the rule announced by previous decisions of the Circuit Courts of Appeals and the Supreme Court. United States v. Young, supra; Rimmerman v. United States, 186 Fed. 307, 108 C. C. A. 385; Rinker v. United States, 151 Fed. 755, 81 C. C. A. 379; Hume v. United States, 118 Fed. 689, 55 C. C. A. 407. An indictment under the statute for using the mails to defraud need not follow the language of the statute, but it is sufficient if the averments bring the charge within the substance and true meaning of the statute. Every element of the offense which is condemned by section 215 is found within the phrase of this indictment. Samuels v. United States, 232 Fed. 536, 146 C. C. A. 494, Ann. Cas. 1917A, 711.

Further, section 1025 of the Revised Statutes (Comp. St. § 1691) provides that "no indictment found and presented by a grand jury in any district (or circuit or other court of the United States) shall be deemed insufficient, nor shall the trial, judgment or other proceeding thereon be affected by reason of any defect or imperfection in matter of form only which shall not tend to the prejudice of the defendant." The failure to plead the quoted words was a matter of form only. It could in no wise be said to prejudice the defendants.

Our conclusion that the indictment is sufficient to charge an offense under section 215 of the Criminal Code makes it unnecessary to discuss the other assignment of error, that the testimony with reference to the sending of the letters named under counts 2 to 8 were incompetent and irrelevant. The basis of this assignment of error is that these counts were bad, and therefore the evidence was inadmissible. Holding otherwise, as we do, the evidence was competent.

Judgment affirmed.