**UNITED STATES v. COHEN et al.**

Nos. 309, 310, 326, 337.

Circuit Court of Appeals, Second Circuit.

Aug. 8, 1944.

Writ of Certiorari Denied Jan. 15, 1945.

See 65 S.Ct. 553.

Walter Brower, of New York City, for Joseph Cohen.

P. Wolf Winer, of New York City, for Mandel Raffe.

Jac M. Wolff, of New York City, for Bertram M. Wachtel.

Samuel W. Altman, of New York City, for Joel Rosenberg.

Philip Handelman, of New York City, for N. E. Rogoff.

James B. M. McNally, U.S. Atty., of New York City (John F. X. McGohey, Peter J. Donoghue, Saul S. Sharison, and David Hartfield, Jr., Asst. U. S. Attys., all of New York City, of counsel), for appellee.

Before L. HAND, SWAN, and CHASE, Circuit Judges.

L. HAND, Circuit Judge.

Five of the twenty-seven defendants, who were brought to trial in this case, appeal. We shall first consider the appeals of three—Cohen, Wachtel and Raffe—since they, perhaps with Fogelson, were the most important actors in a long series of frauds, in some of which all four were confederated, in others of which they apparently operated in two separate groups, as will appear. Rogoff and Rosenberg had subordinate parts in these transactions, and we shall reserve consideration of their appeals until the end. Seventy-five persons were indicted; twenty-eight pleaded guilty before trial; as to nineteen the trial was severed; the indictment was dismissed as to one before trial. Of the above mentioned twenty-seven originally brought to trial on August 5, 1941; verdicts were rendered as to thirteen on March 7 and 8, 1942; thirteen had meanwhile pleaded guilty, and the case had been dismissed by consent as to one. The jury found eleven guilty of the thirteen who remained on March 7 and 8, 1942 and acquitted two; of the eleven convicted six have not appealed, and have presumably already served their sentences, since in no case were these as long as the time that has now elapsed since the verdict. The trial took seven months and the record occupies nearly 12,000 pages. (The stenographer's minutes number almost 16,000 pages.) The indictment was in thirty counts; twenty-nine, for using the mails to defraud—§ 338, Title 18 U.S.C.A.—and the last, for conspiracy to commit that crime. The first twenty-nine counts alleged a single "scheme," and differed only in the "count letters"; i.e., letters mailed, one in each case in furtherance of the "scheme." The conspiracy count alleged twenty-nine "overt acts," of which the first four occurred more than three years before the indictment was found, September 30, 1938. The "scheme" and the conspiracy were, in general, to sell to individuals—called "victims"—interests of various sorts in oil

bearing lands, and shares of stock in a number of corporations: sometimes oil companies, sometimes not; sometimes companies organized by the defendants, sometimes not. All the "count letters" were alleged to have been posted in the Southern District of New York after September 30, 1935.

■ We will premise what we say by dealing at once with an error which pervades the arguments of all the accused. They uniformly assume that an appellate court, before affirming a verdict in a criminal case, will demand that the evidence shall be more cogent and persuasive than when reviewing a civil verdict: i.e. that, since the jury must be satisfied of the accused's guilt beyond a reasonable doubt, an appellate court will more straitly scrutinize the evidence necessary to sustain the verdict. There is indeed authority for that position, but it is not the law as we understand it; on the contrary, the certainty required in a criminal case is that of the jury alone, and evidence sufficient to support a civil verdict will support a criminal one. We shall add nothing to our discussion in Feinberg v. United States, 2 Cir., 140 F.2d 592, 594. See also United States v. Andolschek, 2 Cir., 142 F.2d 503, 504.

The evidence was sufficient to justify the jury in finding that the facts stated in the following narrative were true. In 1929 Raffe was doing business in Boston as a broker; Fogelson joined him as a salesman in the following year, and by 1933 had become important enough to share the profits with him in a land venture in Texas. In that year Cohen and Wachtel were employed in New York in a brokerage house, called Percy Winter & Company; Fogelson left Raffe in 1932 and for a month or so took employment in that company, after which he returned to Boston. In 1933 Raffe was sounding out prospective customers under the assumed name, National Publishers Service, by sending letters to persons whose names he took from a list furnished him by others. From the character of their responses he determined whom to have his salesmen approach with circulars and by interviews. In 1934 he formed a connection with a man named Pike under the name Joel Pike & Company, and they, together with one Goldie and others continued to do the same kind of business. There was ample evidence to justify a finding that in his business with Fogelson, Pike, Goldie and the others, Raffe was guilty of continuous and manifold frauds in the selling of interests in oil lands and shares of stock. These frauds were of various kinds; sometimes by misrepresenting the property in direct sales to the customers; sometimes by wheedling them out of good property or securities. The victims were generally persons—very frequently women—unused to affairs, and ignorant of the kind of property transferred, and the misrepresentations were of the sort with which courts have become familiar; ordinarily, grossly exaggerated, or baseless, estimates of the prospects of the lands or shares as income producers. Frequently, the path would be paved by visits or letters, falsely purporting to be of persons interested in adjacent properties, whose development was said to be dependent upon the acquisition of the property sold to the victim. At other times the salesman would either call up, or be called up by, some fictitious corporation—"Statistical Department" or the like—to give color to the talk.

Fogelson had come back to Boston before Joel Pike & Company had been organized, and was doing business on his own account under another name. His relations with Raffe had not been severed however, and Raffe told him to give to Pike all "potential" oil lands for which Pike asked. While Cohen and Wachtel were working with Percy Winter & Company they had the names of a number of "prospects" in Massachusetts, and, when Fogelson was on a visit to New York in 1934 they gave him some of these names, and he supplied them to Pike's company. In that company was a man named Gaines to whom Wachtel supplied still other names directly; and when Wachtel went to Boston, Pike paid him by cheque for this service. As early as 1933 a man named Mussman, the chief witness for the prosecution, began to work for Raffe. He was, on his own admission, an altogether abandoned character, frank to confess a long career of cheating and fraud; seeking to secure lenity by his testimony, and hostile to the accused. The appellants appear to predicate much of their defence upon the unreliability of his testimony, although the case for the prosecution by no means depended wholly upon him. It is scarcely necessary to repeat the conventional answer: the testimony, even of an un-

corroborated accomplice who turns state's evidence, will support a conviction. Again and again it has satisfied juries of the guilt of those on whom such wretches turn; from time immemorial it has been the reliance of prosecutors; and juries have probably shown their good sense in accepting it. Mussman was no different from the ordinary type, except possibly in the venom he showed against his former confederates. Raffe set him to work upon a number of "prospects," and the two agreed upon the frauds which should be perpetrated upon them; often in order to throw them off the scent the transactions were completed through fictitious names.

Meanwhile Cohen and Wachtel continued business in New York, either as employees or members of Percy Winter & Company; and we will assume for argument that in its earlier stages the business was not fraudulent, although in the light of later events that seems improbable. At any rate late in 1934 Fogelson saw them, and they agreed that they would turn over promising—"qualified"— New England names to him in return for which he was to give them a third of any profits he might make on the transactions. Beginning then, and going through 1935, and perhaps longer, this became a practice between them and went into a number of fraudulent transactions. Gaines of Pike & Company introduced Mussman to Wachtel in New York late in 1934, and Wachtel, later, by a telephone message to Raffe's office, brought Mussman to New York, where he introduced him to his partner, Cohen. By the spring of 1935 Mussman was working for, or in cooperation with, both "partners"; and for some part at least of that time, he was also working for, or in cooperation with Raffe. The prosecution put in evidence of more than 200 separate fraudulent transactions with customers; each of these was a "scheme," each was a "conspiracy," and while we do not understand that any of the accused concedes his guilt in any one, it is unnecessary to go into the evidence in detail, so far as concerns the subordinates who actually made the sales. There can be no doubt about their guilt.

The theory of the prosecution was that Raffe, Cohen and Wachtel were all confederates with these subordinates in a single "scheme," in the execution of which each of the twenty-nine transactions in furtherance of which a "count letter" was mailed, was a step. As we shall show later, Raffe was implicated in the transaction in furtherance of which the "count letter" in Count 2 was mailed; Cohen was similarly implicated in Counts 1, 4, 22, 23 and 27; Wachtel, in Counts 1, 5, 6, 7, 18, 20, 23 and 25. They were implicated, both because they had individually something to do with each of those transactions, and because the transactions were all parts of a "scheme," though that "scheme" may not have been single, or comprehended all the transactions. For the moment we address ourselves to the argument that it was a fatal error to join all the transactions into one and to try them together; that the result was the utter confusion of the jury; and that the three were convicted because of a diffused belief in their complicity in a vast fraud. While, as we have just said, there may have been several separate "schemes," it would have been highly unreasonable to take each transaction as a separate "scheme." Mussman was associated with Raffe in many transactions; in a larger number he was associated with Cohen and Wachtel; in a number Fogelson was also closely associated with Raffe, or was associated with Cohen and Wachtel; in several Goldie was. A jury could certainly find that these were all not several, disconnected and separate, as the accused would have us suppose. They may in fact have found—as we should have—that they were grouped in two general "schemes" or ventures, very alike in structure, and in scope; each one indivisible. To one, which with the prosecution we may call the "scheme" of the Boston Group, Fogelson, Goldie, Mussman and others were parties, along with Raffe. To the other, the "scheme" of the New York Group, Mussman, Coshnear and others were parties along with Cohen and Wachtel. It did not matter that each "scheme" included the sale of shares of stock as well as interests in land; it was enough that the confederates were acting in general concert. Nor did it matter that the personnel of each group varied from time to time; all this was typical in this kind of crime.

And further the jury might have found —as again we should have—that these two "schemes" at times interpenetrated and became one for the time being. This has perhaps already sufficiently appeared, and it may be repetition to note the follow-

ing. Pike said that Wachtel delivered to Gaines three cards of New England customers for $41, and the cheque was that of Pike & Company of which Raffe was a member. This transaction on its face was not individual to either Gaines or Pike. If it was so in fact, and if Raffe never learned of it or profited by it, he did not prove so; and when people see fit to do business under a firm name, it is to be assumed that transactions done in that name are firm transactions. Again, in the case of the Whittaker land in Pittsburgh County, Mussman signed the deed at Wachtel's direction, and Wachtel went to a telephone booth saying he was going to call up Joel Pike & Company; the purpose of the call being to feed the deed of Mussman to Whittaker by a conveyance to Mussman. The only possible sources of land in that county were Joel Pike & Company and Fogelson, and Fogelson was almost sure he never dealt in land in that county. If his memory was right, Raffe's firm was therefore providing land for Wachtel to sell to a "qualified" name. Again in the Pettit transaction Mussman sold land to a woman of that name after getting the name from Wachtel. Later Pike made claim for a share of the proceeds on the ground that it had been he who gave the name. Mussman paid him $400 for that reason which came out of Mussman's own share. As before, although this may have been a side venture of Pike's, nothing of the kind appeared, and, as Pike was Raffe's employee on a salary, we need not gratuitously impute to him any disloyalty. Finally, there was evidence of at least a constant interchange between the two "schemes" in the similarity of the devices adopted, both in the use of names like "Mid-Continent Associates," and "L. J. Cronin," and in other ways.

█ Thus to some extent there was evidence of a concert between Raffe, Cohen and Wachtel in the selling of interests in supposedly oil producing lands; a more or less continuous reciprocal exchange of benefits. We need not find that all the transactions proved were shown to have been parts of that concert; as we have indicated, it is extremely unlikely that they were; the most reasonable interpretation is that, while the two groups worked with a general understanding and with mutual help, each was free to fleece its own customers at its own convenience,

and on its own account, so far as the other did not help it. Therefore, even in the strictest sense there was no variance; a single "scheme" was alleged and a single "scheme" was proved, though by hypothesis it did not include by any means all the transactions proved. The objection, so ardently pressed, comes down therefore to this; that irrelevant evidence was introduced which necessarily confused the jury. There is not the slightest reason to suppose that in fact it did confuse them; on the contrary their verdict gives internal evidence of careful discrimination. But even if they had been confused, it was impossible to avoid it. It was certainly proper to show all the ramifications of the dealings between the two groups; how they trafficked in names with each other; how they adopted the same devices; how the same members shifted back and forth between the two; and how in some cases the same man would apparently be acting for both during the same period. It was not possible to know just where the general "scheme" ended, and where either of the local "schemes" began; and for this reason it was inevitable that most of the evidence admissible in proof of the Boston, or of the New York, "scheme" should go in under the joint "scheme." Neither the prosecution nor the judge could tell in advance whether a given transaction would turn out to be confined to one of the local "schemes," or would fall within the joint "scheme." The judge's course was proper in allowing all the transactions to go before the jury, and then to advise them as he did in several sentences, of which one was as follows: "Where the allegations of the indictment charge a conspiracy and the proof adduced shows that a defendant was engaged in that conspiracy and goes further to show one or more additional conspiracies, the defendant is in no way harmed because of the additional evidence." It is particularly unreasonable for the accused to object that all their misdeeds should be brought to light when they so inextricably confused them themselves: i.e. to complain of that confusion of which they were the authors. It is a strange conception of justice that, if one only tangles one's crimes enough, one gets an immunity because the result is beyond the powers of a jury to unravel.

█ But the whole objection is of no importance anyway. At worst it comes.

to no more than that, instead of being tried upon a single "scheme," the accused were tried upon three "schemes" at the same time. As variance, it would not have mattered if the prosecution had wholly failed to prove any joint "scheme" at all; but had only proved the two local ones. Berger v. United States, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314, definitively held that the question in each case was whether any practical prejudice resulted to the accused from such a variance, and that case is now well settled law, as appears from the decisions which have followed it and which we cite in the margin.* Indeed to allow one "scheme" to be alleged and another to be proved, even though the variance consists only of a change in the conspirators, is really to allow the joinder of two conspiracies; and yet that has never been thought material, in spite of the fact that the first conspiracy is an agreement between those who are parties to it, and if some drop out and others come in, a new conspiracy is formed. For this reason, as we pointed out in United States v. Liss, supra, 137 F.2d 995, the problem is strictly speaking rather one of joinder under § 557 of Title 18 U.S.C.A. The case at bar is an apt example of just that; and the question is the same as though all three supposititious "schemes" had been pleaded as separate counts. Certainly they would have been crimes of the same kind, and, for the reasons we have given, their joinder would have certainly been "proper," unless for the fact that the confederates were not the same in all. It is true that the Eighth Circuit in Coco v. United States, 289 F. 33, held that § 557 did not permit the joinder of crimes when the accused were different, but we held the opposite in United States v. Twentieth Century Bus Operators, 101 F.2d 700, and so has the Seventh Circuit, though by a divided court. United States v. Tuffanelli, 131 F.2d 890, 893, 894. Therefore, even though the jury convicted Raffe for his share in the Boston "scheme," and Cohen and Wachtel for their share in the New York "scheme" their verdict was as valid in law, as it

was eminently sound in morals and good sense.

 The foregoing considerations also dispose of the objections based upon the admission of evidence not shown to be connected with the joint "scheme." Since it was proper to try the local "schemes" along with the general one, it was proper to let in evidence relevant only to those "schemes." So too as to declarations of the various confederates. In accordance with the well-settled rule these were all admissible while the "scheme" was in process of realization, provided they were in furtherance of it. Nor would it make any difference that they were after the indictment was found, if the "scheme" had not yet ended; because, while of course the crime must be complete in all its elements before indictment found, there may be evidence thereafter which tends to prove its past existence. Nor again was it wrong to admit evidence of declarations made after Raffe's departure for Arkansas in October, 1936; not indeed because such declarations would be admissible against him, once he had definitively separated himself from the "scheme," but because, as we have already said, that was a defence which it lay upon him to prove, as will appear later.

 All the accused (except Rogoff who was only convicted on the conspiracy count), also complain that there was not enough evidence of the mailing of the "count letters." In the case of counts 5, 7, 19 and 20 the envelope is in evidence, bearing a post-mark showing that it was mailed within the Southern District of New York; and that was clearly enough. Wigmore § 151. In the case of count 25 the envelope was received in evidence but has disappeared. As to counts 1, 2, 4, 6, 18, 22, 23 and 27 there was testimony that the letters were mailed from New York or nearby. The accused do indeed argue that this testimony was so modified upon cross-examination that, coupled with its somewhat uncertain original character, it must be taken as no testimony at all. We have examined the disputed passages

---

* Blumenthal v. United States, 8 Cir., 88 F.2d 522, 531; Cooper v. United States, 5 Cir., 91 F.2d 195, 198; Marx v. United States, 9 Cir., 96 F.2d 204, 207; Martin v. United States, 10 Cir., 100 F.2d 490, 495; Kopald-Quinn & Co. v. United States, 5 Cir., 101 F.2d 628, 633; United States v. Manton, 2 Cir., 107 F.2d 834, 849; United States v. Mack, 2 Cir., 112 F.2d 290, 291; Chadwick v. United States, 5 Cir., 117 F.2d 902, 904; United States v. Liss, 2 Cir., 137 F.2d 995, 998; Panella v. United States, 4 Cir., 140 F.2d 71, 72.

in all such cases, and we are satisfied that this contention is without basis, though it would unduly extend this opinion to discuss each case in detail. We of course agree that in the case of all the first twenty-nine counts the crime under § 338 was the mailing of the letter, and that this must therefore be in the district where the indictment is found; but no more persuasive evidence is required upon this than upon any other issue in the case.

■ It is to be noted moreover that it is not necessary to prove under § 338 that the "scheme" itself contemplated the use of the mails. That was indeed required under R.S. § 5480 before the amendment of 1909, but the statute was then so modified that it is now enough that during the course of executing the scheme the mails are used. Farmer v. United States, 2 Cir., 223 F. 903, 907; Bogy v. United States, 6 Cir., 96 F.2d 734, 740, 741; Blue v. United States, 6 Cir., 138 F.2d 351, 358, 359. True, the accused must either "place," or "cause to be placed," the "count letter" in the mails; but that does not mean that he must specifically authorize its deposit, it is enough if he knows that in the execution of the scheme letters are likely to be mailed, and if in fact they are mailed. United States v. Kenofskey, 243 U.S. 440, 37 S.Ct. 438, 61 L.Ed. 836; Shea v. United States, 6 Cir., 251 F. 440, 447, 448; Ader v. United States, 7 Cir., 284 F. 13, 25; Hart v. United States, 5 Cir., 112 F.2d 128, 131; Clarke v. United States, 9 Cir., 132 F.2d 538, 541; Blue v. United States, supra, 138 F.2d 351, 359. There can be no question that there was evidence to support the conclusion that all the accused (including on this point Rosenberg and Rogoff), knew perfectly well, not only that the mails might be used in the swindling, but that they were certain to be so used. It is true of course that a letter mailed after the "scheme" was completed will not serve. Mitchell v. United States, 10 Cir., 126 F.2d 550. But in all cases the letters were either before the victim had been despoiled, in the very act of spoliation, or while he was complaining, and to silence what the confederates feelingly described as his "squawks." The only possible color for the contrary is as to Raffe, who, as we have already twice mentioned, argues that he had already abandoned the "scheme" before the "count letter" on which he was convicted was mailed, September 25, 1936. Raffe did not himself take the stand, and he relies upon the testimony of the prosecution to support his pretensions to have abandoned the "scheme" before that date. Cooper, an associate of his, said that he had settled in Gravette, a small village in Arkansas, "in October, 1936" where he went into the nut business. This was after the mailing of the "count letter"; but, even if it had been before, the testimony would not have been conclusive. The judge rightly told the jury that a confederate, once shown to have been such, had the burden of satisfying them that he had withdrawn from the enterprise. Hyde v. United States, 225 U.S. 347, 369, 32 S.Ct. 793, 56 L.Ed. 1114, Ann. Cas.1914A, 614; Local 167 v. United States, 291 U.S. 293, 298, 54 S.Ct. 396, 78 L.Ed. 804; United States v. Rollnick, 2 Cir., 91 F.2d 911, 918; United States v. Anderson, 7 Cir., 101 F.2d 325, 331; United States v. Graham, 2 Cir., 102 F.2d 436, 444; United States v. Weiss, 2 Cir., 103 F.2d 348, 354; United States v. Beck, 7 Cir., 118 F.2d 178, 184, 185; United States v. Perlstein, 3 Cir., 126 F.2d 789, 798.

■ Finally, although it was of course necessary for the prosecution to satisfy the jury as to each of the counts under § 338, upon which Raffe, Cohen or Wachtel was convicted, that the transaction, in furtherance of which the "count letter" was mailed, was part of a "scheme" in which the particular accused was implicated, it was not necessary to show that he had had any part in the immediate transaction. It was enough, if the transaction was itself within the general scope of a "scheme" on which all had embarked; those not immediately concerned in any particular fraud, would none the less be liable, so long as that fraud was within the kind on which all had agreed. United States v. Woods, 2 Cir., 66 F.2d 262; Robinson v. United States, 5 Cir., 94 F.2d 752; Bogy v. United States, 6 Cir., 96 F.2d 734; Spirou v. United States, 2 Cir., 24 F.2d 796; Landay v. United States, 6 Cir., 108 F.2d 698, 703. Each transaction in the counts under which either Cohen or Wachtel, or both, were convicted was within the scope at least of the New York "scheme," just as the transaction in the second count was within the Boston "scheme." We do not mean that there was not also in each instance, evidence

from which the jury might have concluded that each of the three had been directly connected with each particular transaction for which he was convicted; there was, but strictly speaking it was not necessary. For the foregoing reasons we hold that the evidence was sufficient to support the verdict against these three upon all the counts in question. We need add nothing as to count 30 in spite of the fact that a conspiracy differs from a "scheme" in that, being an agreement, the parties must have agreed upon all elements of the crime—including the use of the mails. United States v. Crimmins, 2 Cir., 123 F.2d 271. The missing element—intent to use the mails—was supplied, as we have already indicated in holding that the accused "caused" the "count letters" to be mailed, because the evidence justified the jury in finding that all who took part, understood that the mails would be used in the course of the "scheme."

■ The accused also complain of the conduct of the trial. These objections are varied; we shall not however consider them in detail, but will content ourselves with mentioning those that appear to us to have any serious substance. The chief complaint, often repeated, we have already considered; it is that the evidence was so manifold and complicated that the jury was sure to be confused and lose track of the real issues. We shall add nothing to what we have said except that, if the objection is valid, a prosecutor, faced with such a web, will be forced to single out the most important malefactors and let the small fry escape; for the burden upon the witnesses and upon successive juries of repeated trials would be intolerable. We do not indeed mean that this would excuse the absence of the fundamentals of a fair trial; but these were present. We are dealing only with the chance, and chance alone it is, that a jury may fail to distinguish between the guilty and the innocent; and in deciding the importance of that chance we must not disregard the only available alternative. Moreover, it is impossible to see how the objection, if it were good at all, would be good in the mouths of Raffe, Cohen, or Wachtel, the most important confederates of all.

■ Next as to the conduct of the judge. It is true that he put little or no restraint upon Mussman; but no harm could have come from that. He was a confessed, unblushing rogue, admittedly concerned with making a case against the accused, partly in the hope of lenity for himself, partly apparently from malice. His outbursts of violent abuse against them may well have been so unseemly that, in the interests of decorum alone, the judge should have checked him; but it is extremely unlikely that they hurt the accused a particle. The more he showed his spleen, the more he increased the burden of the prosecution, so far as it relied upon his testimony. To have held him in check—which was probably in any event impossible—would probably have deprived the accused of an added reason for asking the jury not to believe him. As for the suggestion that the judge at any time indicated that he was trustworthy, only the extreme of partisanship could find any basis for it in the record.

■ Cohen took the stand, and upon his cross examination he was asked whether he did not know that several of his associates—one of them a defendant—had been convicted of various crimes all involving deceits. He answered "no" in each case, although the jury may well have understood, and probably did understand, that the persons mentioned had been so convicted. That possibility was however inherent in any attempt to bring out whether Cohen did in fact know that his associates had been so convicted; and that knowledge, if he had it, was altogether relevant, considering the sort of business in which he was engaged. The objection purports to be supported by a number of decisions (of which United States v. Nettl, 3 Cir., 121 F.2d 927 will serve as an example), holding that a prosecutor may not impeach an accused (the doctrine would also apply to any witness), by so strongly implying in cross examination that he has been convicted that the jury will not credit his denial, but will accept the implication. Whether United States v. Nettl went further, and meant to follow the earlier doctrine of the common-law (Wigmore § 980, sub. 5) that only the record of the conviction would serve is not entirely plain. In any event the accused at bar altogether misapply the rule. The conviction of Cohen's associates would as such have been wholly incompetent (except indeed in the case of that one who was a defendant and then only to impeach him if he had taken the stand). But it was both competent

and relevant to prove that Cohen had employed as subordinates, or been associated with those, whom he knew to have been convicted of such crimes. One way to prove this was to ask it on cross examination; another would have been to call a witness and prove it against him. But the notion that it was improper to ask the question would rule out a large part of cross examination. It is quite true that in the case at bar the questions were so put as to show that the prosecutor meant to assert that Cohen's associates had all been in fact convicted; and that was improper. But it did not impeach Cohen's denial that he knew of the convictions; and, although the upshot may have been to smirch Cohen by leaving in the jury's minds the belief that he had employed, or been associated with, convicts, the question, however limited, would have had that tendency anyway. Any added emphasis, due to repetition, was far too light to count in the scale.

 The denial of a bill of particulars in March, 1939, may, or may not, have been an abuse of discretion; it is seldom if ever a reversible error even when it is. Hindman v. United States, 6 Cir., 292 F. 679, 681. But the objection is frivolous in any event, for the denial could not possibly have prejudiced the accused. The prosecution opened in August 1941, and did not close its case until December; and the notion that any one of them had not had ample opportunity to prepare his defence, or could have been surprised without opportunity to retrieve his position, is too unreasonable for discussion.

 Complaint is also made of the refusal of the judge to allow Cohen to examine the testimony of Mussman before the grand jury and of written statements made by him and given to the prosecutor. We have very recently considered this question in United States v. Krulewitch, 145 F.2d 76, and we need not repeat what we there said. We held that when statements are taken by the prosecution which appear upon inspection by the judge to contradict the testimony of the witness when he is called at the trial, the accused should be allowed to inspect them, since he cannot otherwise impeach the witness. At one stage of the trial the accused did ask the judge to inspect certain supposed statements, in order to see how far they contradicted Mussman. The judge examined the documents and sealed them; they are a part of the record. We too have examined them, and they had no impeaching value whatever.

 We come therefore to the judge's charge. We have already considered and dismissed the criticism of that part of it which allowed the jury to convict the several accused upon separate "schemes" or conspiracies. We can find nothing to justify the complaint that the judge bore against the accused and favored the prosecution. He stated the prosecution's charges in detail, and told the jury that those of the accused who had taken the stand, had denied their guilt; he added that the evidence was conflicting and that they must find guilt beyond a reasonable doubt. So far, no one could complain, and indeed the real grievance appears to be that in a case of such great complexity, asserted to have been incurable by any charge of any judge, the judge did not discuss the facts at all. While the accused concede that he was under no absolute duty to do so, they argue that in this particular instance his failure to exert his undoubted powers necessarily resulted in a miscarriage of justice. Granting for argument, they say, that their rights were not in any event hopelessly compromised by such a trial, nothing less than a detailed discussion could have saved them. Such reasoning may seem plausible, but in application it falls apart. If the judge had once embarked upon a consideration of the transactions in detail, he would have committed himself to a discussion of them all; otherwise he would surely have laid himself open to the charge of undue emphasis. On the other hand, to undertake such a Herculean task would not have helped the jury, but merely have added to the weight of verbiage that they had already been called upon to bear during twelve days of summing up by counsel. Moreover, it would not have been humanly possible to do so without either making serious slips, or of seeming to favor one side or the other. It is possible that there may be judges who could safely do so—Lord Cockburn summed up the Tichbourne Case for a week or more—but it is beyond the powers of all but the merest few, assuming that there are any who can do it. And, whatever be the rule across the water, in this country not only has the exercise of the power never been obligatory, but the power itself has been somewhat suspect.

It is strange to hear an accused complaining of such a failure; we may be assured that, if the power had been used, the complaints would have been louder, and almost certainly better grounded.

The accused also complain of the judge's refusal to consider and charge any of the 366 requests which collectively they submitted to him. We have again and again discountenanced requests in such numbers. We do not of course mean that the parties to any trial, civil or criminal, should not be allowed to suggest to the judge what they believe to be their rights, privileges, or immunities. No doubt, in disregarding all requests, a judge takes his chances that he may have forgotten something substantial. But in this case he had not done so; if he had given the instructions in ipsissimis verbis, he would have merely added to whatever was that confusion against which the accused so vociferously protest. Whatever enlightenment a jury gets, ordinarily it gets from the colloquial charge, and from any later colloquial additions to it. It is exceedingly doubtful whether a succession of abstract propositions of law, pronounced staccato, has any effect but to give them a dazed sense of being called upon to apply some esoteric mental processes, beyond the scope of their daily experience which should be their reliance. It is true that in many jurisdictions such requests are taken more seriously than we take them; we can only say in answer, that to do so appears to us to be part of that attitude towards the institution, which on the one hand affects to suppose that laymen are capable of making effective use of any number of abstract legal propositions, couched in unfamiliar terms, while on the other hand, they are subject to whims, caprices and passions which make the slightest alien intrusion a ground for upsetting all that they may have done. We do not share that attitude.

To what we have said there is indeed one exception which raises the only really important doubt in the whole trial. It touches the statute of limitations, and is limited to count thirty: the conspiracy count. As we have said, the draughtsman of the indictment quite unnecessarily multiplied the overt acts by alleging twenty-nine in all, of which the first four were laid before September 30, 1935: i.e. before the period of limitation. The accused argue that, since the judge did not take these four acts away from the jury, it is possible that the only acts they found were these, or some of them; and that, if so, the statute was a bar, because it begins to run from the last overt act found. This argument is formally good, if the law is good, and there is undoubtedly authority for the proposition that the period does so run. Even so, as applied to the case at bar, the possibility was so remote as to have the least possible practical importance, for the first four overt acts were all talks in New York between Mussman, Cohen and Wachtel, and there were twelve other such overt acts: i.e. talks or meetings between Mussman and either Cohen or Wachtel, or some of the others, all laid within the period of limitation. Besides these, there were ten or more, which consisted of mailing letters or other documentary acts, which were also in season. It is in the highest degree unlikely that the jury actually selected one or more of the earlier talks, and refused to find any of the other talks or the mailing of any of the letters. Nevertheless, against that purely theoretical chance, it may be necessary to make some conclusion on the point of law involved.

It must be owned that there is a body of authority, as we have said, that the statute of limitations runs from the last overt act which has been proved. In addition to early decisions in the district and circuit courts, the Eighth Circuit has so declared in Ware v. United States, 154 F. 577, 12 L.R.A.,N.S., 1053, 12 Ann.Cas. 233, and in Culp v. United States, 131 F.2d 93, 100; so has the Ninth in Jones v. United States, 162 F. 417, 425 and in Hedderly v. United States, 193 F. 561, 569; and so has the Court of Appeals of the District in Lorenz v. United States, 24 App.DC. 337, 387. Indeed, in Brown v. Elliott, 225 U.S. 392, 401, 32 S.Ct. 812, 56 L.Ed. 1136, a passage to that purport from Lonabaugh v. United States, 8 Cir., 179 F. 476, was quoted with apparent approval. However, all these decisions were upon records where there had been an overt act within the statutory period, and where it was therefore not necessary to decide the point. The only decisions that we have found in appellate courts, which demanded a decision on the point are two in the Eighth Circuit: Lonabaugh v. United States which we have just cited, and McWhorter v. United States, 299 F.

780, which curiously enough, did not cite Lonabaugh v. United States. On the other hand we cannot read United States v. Kissel, 218 U.S. 601, 31 S.Ct. 124, 54 L.Ed. 1168, in any other sense than as contrary to such a notion. It came up upon demurrer to a plea in bar, based upon the statute of limitations, in which the accused had alleged that all the overt acts pleaded, which had happened within three years after indictment found, had been done without "his participation, consent, or knowledge." 218 U.S. at page 606, 31 S.Ct. at page 125, 54 L.Ed. 1168. Nevertheless, the Supreme Court reversed a judgment sustaining the plea, reasoning that if the conspirators continue "efforts in pursuance of the plan, the conspiracy continues up to the time of abandonment or success." 218 U.S. at page 608, 31 S.Ct. at page 126, 54 L.Ed. 1168. We do not forget that the indictment there involved was under the Sherman Act in which no overt act is necessary; but it seems to us incredible that this should make any difference: that is, that a conspiracy, which is not a crime until some step is taken in performance of it, should be held to end earlier than a conspiracy which is a crime ab initio. It has been said over and over again that the conspiracy, not the overt act, is the "gist" of the crime. United States v. Hirsch, 100 U.S. 33, 34, 25 L.Ed. 539; United States v. Britton, 108 U.S. 199, 204, 2 S.Ct. 531, 27 L.Ed. 698; Bannon v. United States, 156 U.S. 464, 468, 15 S.Ct. 467, 39 L.Ed. 494; Joplin Mercantile Co. v. United States, 236 U.S. 531, 535, 35 S.Ct. 291, 59 L.Ed. 705; Pierce v. United States, 252 U.S. 239, 244, 40 S.Ct. 205, 64 L.Ed. 542; Braverman v. United States, 317 U.S. 49, 53, 63 S.Ct. 99, 87 L.Ed. 23. It is true that in Hyde v. United States, 225 U.S. 347, 357, 32 S.Ct. 793, 56 L.Ed. 1114, Ann.Cas.1914A, 614, a majority of the court held that the conspirators take part in the conspiracy in every district in which any overt act occurs; but that does not fuse the conspiracy with the act, but rather the act with the conspiracy —carrying the conspiracy into every part of its performance, but in no sense limiting it to its performance. In principle, surely the doctrine cannot stand up; a condition interposed to prevent the conspiracy from becoming a crime until the parties have done something to effectuate it, cannot in reason be said to end as soon

as it begins, and to require revival by some later step. De facto that is absurd; de jure, it identifies the conspiracy with the act. Finally, the practical consequences of such a doctrine would be most serious: conspirators would secure immunity if they agreed to seek cover, and awaited a propitious moment to resume their activities. For the foregoing reasons we do not find it necessary to consider whether the theoretical error which the record would present, if the law were as the accused argue, is in any case real enough to be ground for a reversal of the convictions on the conspiracy count.

The foregoing are the only questions which we shall discuss: for the rest, even were they errors, we should not because of them reverse convictions so just upon the merits. Raffe, Cohen and Wachtel were the chiefs of a wide-spread skein of mean and callous fraud: the plunder of simple people, often of modest means, by practicing upon their inexperience by the lure of speculative profits. In spite of the recent elaborate legislative attempts to protect such folk, they remain, and probably always will remain, apt gulls for this kind of bait, enticingly strewn before them by skillful knaves. In spite of the length of the trial and the complication it involved, all the essentials of justice were accorded them. None of their multitudinous objections go to the heart of the matter; and while, like everyone else on trial for crime, they were entitled to whatever the established procedure gave, we have no disposition to stretch any points in their favor. In spite of the fact that their sentences were cumulative, we do not incline to intervene. Their convictions will be affirmed, except that in the case of Raffe, the fine must be reduced from $2500 to $1000, the maximum allowed under § 338 of Title 18 U.S.C.A.

 As to Joel Rosenberg, although there is ample evidence to connect him with the New York "scheme," his part in it, so far as appeared, was limited and occasional; he was not confederate to the venture as a whole in the sense that Cohen, Wachtel, Mussman and Coshnear were. For this reason the prosecution cannot properly say that the Fennikoh, or the McDonald, transaction fell within the scope of any general "scheme" to which Joel Rosenberg had

affiliated himself; and it was obliged to connect him specifically with any counts on which he was to be convicted. It so happens that there was not enough evidence to connect him with the Fennikoh count at all; and that the prosecution did not prove that he had become a party to the McDonald transaction before December 7, 1936, the date of the mailing of the "count letter." Our reasons for these conclusions are as follows: As to the Fennikoh transaction, Joel Rosenberg was indeed present in a car and waited outside, while Mussman went into Fennikoh's house at Livingston Manor, and tried to appease him. Wachtel had given Fennikoh's name to Mussman, and so had another of the accused, Edward Rosenberg; and later Mussman divided his gains with Wachtel, Coshnear and either this Edward Rosenberg, or with Joel. The case against Joel depends upon whether he was the Rosenberg with whom Mussman did divide the loot, for Joel's mere presence in the car while Mussman went into Fennikoh's house, was not enough to implicate him. It is true that, when Mussman first spoke of the "split," as he called it, he named "Joe," but almost immediately he changed this to Edward, and to that he adhered on his cross examination. There is no real doubt that his first mention of Joel was not intentional, and the case against him on count 7 was not therefore proved. Indeed, Mussman would scarcely have "split" with Joel to whom he owed nothing, but rather with Edward, who shared with Wachtel in setting him upon Fennikoh. As to count 19, while there was ample testimony to support a verdict that Joel Rosenberg was party to the fraud upon the McDonalds, Mussman was altogether vague as to the time when Joel joined him and Goldie in the transaction, and there was no other testimony to fix it. The "count letter" being dated December 7, 1936, and the posting of the letter being under all the authorities the corpus delicti, there was no evidence to support the verdict. Olsen v. United States, 2 Cir., 287 F. 85; Armstrong v. United States, 10 Cir., 65 F.2d 853, 857. For these reasons the conviction of Joel Rosenberg on counts 7 and 19 must be reversed.

 On the other hand his conviction on the conspiracy count should be affirmed. As we have just said, there was testimony directly connecting him with the McDonald frauds, and his argument that the jury should not have believed it is unsound, as we have seen. Nor were there any errors which demand reversal. He complains of the admission against him of the opinion of the Tenth Circuit in Rosenberg v. United States, 120 F.2d 935, in which it reversed a conviction against him in another case, this reversal resulting in the dismissal of the indictment. He could not have more deliberately invited the admission of this opinion than by volunteering the statement which he made upon the stand that, although he had been convicted, the judgment was reversed and the indictment dismissed. His purpose was obviously to give the jury to understand that he was cleared of any part in the fraud that was there involved, and that was a totally false purpose. He was not cleared at all; the indictment was dismissed only because the prosecution failed to prove the mailing of the "count letter," as the prosecution has failed here. He also complains of the refusal to let him inspect the minutes of the testimony of Ellen McDonald, who had died before the trial. On what theory he should have been allowed to see the testimony of a witness who could not be called, and the record of whose testimony would have been hearsay, we are not advised.

It is indeed true that there is hardship, and perhaps some danger, in trying a man, shown to have had so little share in a conspiracy with those, who like Raffe, Cohen and Wachtel were its directing heads. There was little or no reason to suppose that Joel Rosenberg had had any dealings at all with the Boston group, for example, or with many of the transactions of the New York group. Nevertheless, what we have already said about joinder of the accused, applies to the smaller participants as well as to the more important. That they may be convicted merely because of their association is possible, though it is certainly no more than a speculation to assume so; but there is no practical alternative except, as we have said, to give them immunity. The chance that a joint trial will not as to them be a fair trial, has to be balanced against the fact that it is a joint trial or none. Indeed, if we were to accept the argument, there would really be an end of trials for jointly conceived, or jointly executed, crimes, except in cases of the simplest

character. For these reasons the conviction of Joel Rosenberg upon count 30 will be affirmed.

We need add nothing as to Rogoff; the evidence amply implicated him in the conspiracy; indeed, his argument, like Rosenberg's, comes to little more than that the jury should not have believed the witnesses. What we have just said about trying Rosenberg with the others, also applies equally to him. His conviction will be affirmed.

Conviction of Raffe on count two affirmed, except that the fine imposed is reduced to $1000; conviction on count thirty affirmed.

Convictions of Cohen on counts one, four, twenty-two, twenty-three, twenty-seven and thirty affirmed.

Convictions of Wachtel on counts one, five, six, seven, eighteen, twenty, twenty-two, twenty-three, twenty-five and thirty affirmed.

Convictions of Rosenberg on counts seven and nineteen, reversed; conviction on count thirty affirmed.

Conviction of Rogoff on count thirty affirmed.