**UNITED STATES of America,**
**Appellee,**

v.

**Harry LEV, Marvin Rubin, Maurice Ades and Raymond Wool, Defendants-**
**Appellants.**

**No. 283, Docket 24809.**

United States Court of Appeals
Second Circuit.

Argued April 29, 1958.

Decided Aug. 11, 1958.

of Gallop, Climenko & Gould, New York City, on the brief), for defendant-appellant Harry Lev.

John T. Sullivan, New York City, for defendant-appellant Marvin Rubin.

Thomas J. Short, of Dougherty, Ryan & Mahoney, New York City, for defendant-appellant Maurice Ades.

Albert H. Treiman, New York City, for defendant-appellant Raymond Wool.

Arthur H. Christy, Chief Asst. U. S. Atty., S.D.N.Y., New York City (Paul W. Williams, U. S. Atty., and Fioravante G. Perrotta and Joseph P. Altier, Asst. U. S. Attys., New York City, on the brief), for appellee.

Before CLARK, Chief Judge, and HINCKS and STEWART, Circuit Judges.

CLARK, Chief Judge.

Harry Lev, Marvin Rubin, Maurice Ades, and Raymond Wool appeal from a verdict and judgment of conviction for conspiracy to defraud the Government in violation of 18 U.S.C. § 371. Rubin also appeals from a conviction for bribery in violation of 18 U.S.C. § 201. The defendants were indicted for a single conspiracy to defraud the United States in the administration and procurement of Government contracts. Alleged errors involve principally a claimed variance between a charge of a single conspiracy and proof of two, and a failure to order a statement from a Government witness delivered to the defense for use in cross-examination. Ades and Wool also claim an insufficiency of the evidence, as does Rubin with respect to the bribery charge.

The proof adduced at the trial below tended to show overt acts between February 1952 and about August 1953 involving the procurement and administration of two contracts awarded to Bonita Originals, Inc., for the manufacture of Army garrison caps, and overt acts in the period commencing in April 1953 and continuing on into 1954 involving the procurement and administration of a contract awarded to Spencer Manufacturing Corporation for the manufacture

Milton S. Gould, of Gallop, Climenko & Gould, New York City (George Trosk,

of white hats for the Navy. During the former period Ades was the president and owner of 50 per cent of the stock of Bonita, Rubin was employed by Bonita on a profit-sharing basis to deal with Government officials on the garrison cap transaction, and Wool, an Army officer in the Quartermaster Corps, was assigned the Bonita contracts for administration until they were completed. Lev was not involved in either the procurement or the administration of the Bonita contracts. But Lev, Ades, and Rubin were all interested in Spencer Manufacturing Corporation and involved in the procurement and administration of the white hat contract. Wool was appointed a Contracting Officer of the Armed Services Textile and Apparel Procurement Agency (ASTAPA) prior to the award of the white hat contract and participated in both the award and the administration of that contract. On this proof Judge Kaufman, for the defendants' benefit, charged the jury that in fact two separate conspiracies were involved— the Bonita conspiracy and the white hat conspiracy—although he expressed doubts as to whether it was improper to characterize the conspiracy as a single one.

Defendants urge that a fatal variance occurred between the indictment and the proof concerning the number of conspiracies, and that this error was compounded by confusion on this point in the court's charge to the jury. A claim of variance is not unusual in a conspiracy case, United States v. Rosenberg, 2 Cir., 150 F.2d 788, 793, certiorari denied 326 U.S. 752, 66 S.Ct. 90, 90 L.Ed. 451, and the courts have not evolved clear lines for distinguishing single and multiple conspiracy situations. Cf. Blumenthal v. United States, 332 U.S. 539, 68 S.Ct. 248, 92 L.Ed. 154; Berger v. United States, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314; Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557; United States v. Cohen, 2 Cir., 145 F.2d 82, certiorari denied Cohen v. United States, 323 U.S. 799, 65 S.Ct. 553, 89 L.Ed. 637; Monroe v. United States, 98 U.S.App.

D.C. 228, 234 F.2d 49, certiorari denied 352 U.S. 873, 77 S.Ct. 94, 1 L.Ed.2d 76; Canella v. United States, 9 Cir., 157 F.2d 470. Here, although from Lev's vantage point the Bonita transaction was completely separate from the white hat transaction, from the viewpoint of the other appellants the conspiracy was a single one to defraud the Government in matters of war contracts. Thus as to Rubin, Ades, and Wool, who were involved in both transactions, there is, properly speaking, no variance. See Canella v. United States, supra, 9 Cir., 157 F.2d 470; cf. Blumenthal v. United States, supra, 332 U.S. 539, 68 S.Ct. 248, 92 L.Ed. 154.

As Lev was involved only in the latter transaction, a more serious question of variance does arise as to him. In Berger v. United States, supra, 295 U.S. 78, 82, 55 S.Ct. 629, 630, 79 L.Ed. 1314, and Kotteakos v. United States, supra, 328 U.S. 750, 757, 66 S.Ct. 1239, 90 L. Ed. 1557, the Supreme Court set out the applicable rule in these circumstances: "The true inquiry, therefore, is not whether there has been a variance in proof, but whether there has been such a variance as to 'effect the substantial rights' of the accused." In this Circuit the test applied has been stated as whether the conspiracies ultimately proved might have been joined in a single indictment and whether the trial was conducted so as to protect the rights of defendants who are not common to all conspiracies. United States v. Cohen, supra, 2 Cir., 145 F.2d 82, 89. Although Lev claims that the confusion inherent in the indictment was compounded by the court's instructions, a thorough reading of the charge shows that Judge Kaufman was scrupulous in protecting Lev's rights. In fact it is apparent that the jury was able to differentiate between the evidence relevant to defendants involved in only one of the conspiracies, for it acquitted defendant Pollock, who was alleged to be involved solely in the Bonita affair. It follows that the variance here was not prejudicial and was at most harmless error.

■ Ades and Wool claim that the evidence linking them to the conspiracy was insufficient to justify admitting in evidence against them the admissions of other conspirators. Two witnesses for the prosecution gave important evidence involving particularly statements by Rubin defining and particularizing the use of funds to pay for entertainment of and gifts to the Government inspectors. These were Carlin, accountant for Bonita, and Levy, secretary-treasurer and co-owner of Bonita. Levy's testimony particularly went into details of funds drawn by him for uses which Rubin's directions and explanations to him showed were improper, definitely bringing the others, notably Ades and Wool, into the conspiracy. Hence we must consider the independent evidence supporting the inference of participation in the conspiracy and justifying the receipt of this testimony against them.

The independent evidence linking Ades to the illegal plot shows that he was present at a meeting with Rubin in the spring of 1952 where Rubin allegedly stated that he would need 5 to 7 per cent of the contract price in order to entertain Government personnel. Ades then went to Puerto Rico, where he managed the factory which manufactured the caps and hats supplied the Government. There is testimony that, while running the plant in Puerto Rico, he induced a Government inspector, Ienni, to live at his apartment rent free; that he brought another Government employee named Schlesinger to Puerto Rico secretly under an alias; that he attempted to bribe another inspector, Watkins; that he wrote a letter attempting to have Forcillo, a Government inspector, removed because he was too tough; and that, even before the white hat contract was awarded, he was bragging that they would receive it.

As to Captain Wool, the proof was that he went to visit Rubin's office several times; that as the officer supervising the procurement he granted valuable contractual deviations whenever they were requested, both in the Bonita contract and later to Lev; that he had several meetings with Lev before the opening of the bid on the white hat contract; and that as contracting officer he approved Lev's bid, although the pre-award survey showed that Lev had no machinery at all in Puerto Rico to manufacture the hats. There was testimony that in May or June 1953 Wool came to the Bonita office and took a topcoat and again, some children's dresses. There was further evidence from Rubin's doctor, Dr. Franklin, who testified that Rubin introduced Wool to him and that he treated Wool on nine separate office visits and rendered a bill for $265, which was paid by a check from the Bonita Corporation for $285 (thus including $20 for Rubin himself). Later when Rubin came to testify he said that Wool's affliction was deep-seated and of long standing, which no Army doctor had been able to reach, but which Dr. Franklin proceeded to cure by this course of treatment. This evidence stands uncontradicted on the record, and Wool (who did not testify) offered no satisfactory explanation of Bonita's making this payment for him. There was also considerable circumstantial evidence tending to show, when coupled with testimony as to statements made by an alleged coconspirator, that a month after the white hat contract was awarded Lev advanced him $5,000, which he used to complete payments on the purchase of a house. Later in testifying to a Senate committee investigating these frauds he claimed to have borrowed money and given a note to one Luciano, who denied this in testifying below. This testimony was presented by the Government to show consciousness of guilt. Thus the evidence offered as to both Ades and Wool presents amply sufficient groundwork for the admission of testimony of statements by coconspirators and in particular for Levy's terribly devastating testimony, which, when believed by the jury, left no question of guilt.

■ Defendants Lev and Rubin assert that the trial court committed reversible error in refusing to order the Government to produce for their inspection a

statement made by Government witness Carlin to agents of a Senate investigating committee. Since the decision in Jencks v. United States, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103, we know that the trial judge was in error in refusing the order on the ground that the defendants had not established inconsistencies between the statement and the witness' testimony. But before a new trial is to be ordered, we must see if the statement is in any event discoverable. Although the statement is not a part of the lower court record, the prosecutor—who did not have it at the trial—has procured from the Senate committee and presented to us in a sealed envelope a verified copy of a Senate investigator's summary of an interview with Carlin. An additional affidavit establishes that this summary is the only written record made of Carlin's interview, and that it was written following the interview and is not a substantially verbatim record of Carlin's statement. We have examined the summary, and internal evidence from it tends also to bear this out.

While defendants may perhaps have been given a right to inspect a statement of this nature by the Jencks decision, supra, 353 U.S. 657, 668, 77 S.Ct. 1007, 1013, 1 L.Ed.2d 1103,[1] the recent codification of discovery in this situation allows a defendant to examine only the following:

"(1) a written statement made by said witness and signed or otherwise adopted or approved by him; or

"(2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness to an agent of the Government and recorded contemporaneously with the making of such oral statement."
18 U.S.C. § 3500(e) (1) (2).

As this statute will apply on a new trial of any of these defendants, and as under it discovery of the summary cannot be required, the trial court's error is rendered harmless, United States v. Miller, 2 Cir., 248 F.2d 163, certiorari denied Miller v. United States, 355 U.S. 905, 78 S.Ct. 332, 2 L.Ed.2d 261.

■ There remains to be discussed Rubin's contention that there was insufficient evidence for the jury to have convicted him of bribery. We think the evidence quite sufficient. There was proof that Chief Inspector Porreca, whose duty it was to assign inspectors, upon a request had removed Forcillo from Puerto Rico and replaced him with a more lenient man. Thereafter Rubin sent Porreca a deep freeze, for which Bonita paid. Porreca later received some meat to put in the freezer. He testified that he never paid for any of this, nor was he ever asked to pay for it. This was enough evidence of violation of the bribery statute, 18 U.S.C. § 201. The defense efforts to show that nothing Porreca did actually defrauded the Government are irrelevant as the statute shows.

This important trial discloses a sad and sordid picture of Government agents yielding to rather cheap temptation, some willingly, some only under pressure. But there is another side to the story, of inspectors who stood out at all times against such debauchery of their obligations and who were transferred to other activities for their pains. It is to be hoped that they received no permanent setbacks in their careers, but eventually were accorded that proper respect which they so richly merited.

Convictions affirmed.

---

1. Here the Court said: "We now hold that the petitioner was entitled to an order directing the Government to produce for inspection all reports of Matusow and Ford in its possession, written and, when orally made, as recorded by the F. B. I., touching the events and activities as to which they testified at the trial." While not specified, it seems inferable that the FBI recording of the reports made orally was contemporaneous with the making of the oral statements.